IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Remanded by Supreme Court June 28, 2004

## ANTHONY DARRELL HINES v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Cheatham County**
**No. 9852      Robert E. Burch, Judge**

---

**No. M2004-01610-CCA-RM-PD - Filed July 14, 2004**

---

The opinion of the court in this matter was released on January 23, 2004, and the petitioner filed an application for permission to appeal. On June 28, 2004, our supreme court granted the application and remanded to this court, directing that we reconsider our previous conclusion that "the trial court charged the incorrect version of the aggravating circumstance in Tennessee Code Annotated section 39-2-203(i)(5) (1982)." We have reconsidered this issue and conclude that the trial court utilized the correct version of this statute when instructing the jury at the resentencing hearing as to aggravating circumstances. Additionally, as explained in this opinion on remand, we erred in the original opinion by stating that our supreme court had addressed, in the direct appeal of the resentencing hearing, whether "instructing an inapplicable version of aggravating circumstance (i)(5) was harmless error." In fact, the court did not do so. In our opinion on remand, we again affirm the post-conviction court's denial of relief, and refile our opinion which has been altered only to reflect our consideration of those matters, as previously explained, set out in the remand order.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOE G. RILEY and THOMAS T. WOODALL, JJ., joined.

Donald E. Dawson, Post-Conviction Defender; and Jon Joseph Tucci, Assistant Post-Conviction Defender, Nashville, Tennessee, for the appellant, Anthony Darrell Hines.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Angele M. Gregory, Assistant Attorney General; Dan M. Alsobrooks, District Attorney General; and B. Dent Morriss, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION ON REMAND

## I. BACKGROUND

The petitioner, Anthony Darrell Hines, was originally tried in 1986 in the Cheatham County Circuit Court for the murder of Katherine Jean Jenkins. The jury found him guilty of first degree felony murder and sentenced him to death. Although the petitioner's 1986 conviction for first degree felony murder was affirmed on direct appeal by the Tennessee Supreme Court, the case was remanded for resentencing because of erroneous jury instructions. State v. Hines, 758 S.W.2d 515 (Tenn. 1988).

On remand, the Cheatham County jury again sentenced the petitioner to death, finding three aggravating circumstances: "[t]he [petitioner] was previously convicted of one or more felonies, other than the present charge, which involve the use or threat of violence to the person," Tenn. Code Ann. § 39-2-203(i)(2) (1982); "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind," id. § 39-2-203(i)(5) (1982); and "[t]he murder was committed while the [petitioner] was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb," id. § 39-2-203(i)(7) (1982). Subsequently, the Tennessee Supreme Court affirmed the petitioner's conviction and death sentence, and the United States Supreme Court denied certiorari. State v. Hines, 919 S.W.2d 573 (Tenn. 1995), cert. denied, 519 U.S. 847, 117 S. Ct. 133, 136 L. Ed. 2d 82 (1996).

The petitioner filed a petition for post-conviction relief on March 4, 1997, which was twice amended. On May 9, 2002, after evidentiary hearings, the post-conviction court filed its findings of fact and conclusions of law and entered an order denying the petition.

## A. Proof Presented at 1986 Trial

The following proof, introduced at the petitioner's original trial in 1986, was set out by our supreme court in affirming the petitioner's conviction:

> Between 1:00 and 1:30 p.m. on 3 March 1985 the body of Katherine Jean Jenkins was discovered wrapped in a sheet in Room 21 of the CeBon Motel off Interstate 40 at Kingston Springs. The victim was a maid at the motel and had been in the process of cleaning the room when she was killed. Her outer clothing had been pulled up to her breasts. Her panties had been cut or torn in two pieces and were found in another area of the room. A $20 bill had been placed under the wrist band [sic] of her watch.

> The cause of death was multiple stab wounds to the chest. Four deep, penetrating wounds, ranging from 2.5 inches to 6.4 inches in depth, had been inflicted about the victim's chest with a knife similar to a butcher knife or a hunting knife. Other superficial cuts were found in the area of the neck and clavicle. There was also a

knife wound which penetrated through the upper portion of the vagina into the mesentery in the lower part of the abdominal cavity. Dr. Charles Harlan who performed the autopsy on the victim's body testified that in view of the small amount of blood in the vaginal vault it was his opinion the wound occurred at or about the time of death. The victim also had what he described as "defensive wounds" on her hands and arms.

Jenkins had been left in charge of the motel at about 9:30 a.m. At that time the occupants of Rooms 9, 21 and 24 had not yet checked out. When the manager left her in charge she was given a Cheatham County State Bank bag containing $100 in small bills to make change for motel guests as they paid. The bank bag, bloody and empty, was discovered in the room with her body. It was her established habit to lock her automobile at all times and to keep her keys and billfold on her person when she worked. Her car keys, billfold and her 1980 silver-colored Volvo were missing.

On 1 March 1985 defendant had departed by bus from Raleigh, North Carolina. He had been given a non-refundable ticket to Bowling Green, Kentucky and $20 in spending money. The traveling time from Raleigh, North Carolina to Nashville, Tennessee was approximately 17 hours. Prior to his departure he was observed by a witness to be carrying a hunting knife in a sheath which was concealed beneath his shirt. The witness admonished him that he could not carry a knife like that on the bus to which he responded "I never go anywhere naked." "I always have my blade." Sometime in the early morning hours of 3 March 1985 he checked in and was assigned to Room 9 at the CeBon Motel. He was wearing a green army-type fatigue jacket, fatigue pants and boots. He was next seen at approximately 9:30 a.m. walking in a direction from his room toward a drink machine. At that time he told the manager he was not yet ready to check out. He was also seen sometime prior to 9:30 purchasing a sandwich at a deli-restaurant across the street from the motel. The same witness who saw defendant also saw another stranger there somewhere between 1:30 and 2:30 who she described as taller than defendant with dark hair, kinky looking and wild-eyed. He departed the restaurant in the general direction of the CeBon Motel. The Cheatham County Sheriff testified that he responded to a call to the CeBon Motel at 2:37 p.m. When he arrived on the scene blood spots in the room were beginning to dry and the body was beginning to stiffen. Defendant was seen between 11:00 and 11:30 a.m. walking from the direction of the Interstate toward the CeBon

Motel. At 12:40 p.m. a witness saw the victim's Volvo automobile pulling out from the CeBon Motel driveway. It was being operated by a person who appeared to be a man with very short, light colored hair. The vehicle crossed over the Interstate and turned east on Interstate 40. She followed behind and endeavored to catch up but it sped off toward Nashville at a high rate of speed. Defendant was next identified in possession of the car a few miles past Gallatin on Interstate 65, heading in the direction of Bowling Green, Kentucky. A group of young people first endeavored to help him start the stalled automobile and then gave him a ride to Bowling Green. During the trip to Bowling Green one of these witnesses observed some dried blood on the right shoulder of his shirt. He carried a jacket which he kept folded. After he arrived at his sister's home in Bowling Green[,] defendant told her he had endeavored to pay another day's rent at a motel when he was attacked by the motel operator. He demonstrated to her how he had stabbed the man. He also related to her he had a sum of money. She could not remember whether he said $35,000 or $3,500. Defendant also told his sister's husband he had earned approximately $7,000 working as a mechanic in North Carolina. He displayed a set of keys to a Volvo automobile and explained that a man who had given him a ride attempted to rob him. Defendant purportedly grabbed the steering wheel and when the car ran off the road he grabbed the keys and ran. According to the witness he was wearing an army fatigue jacket which had something large, heavy and bulky in the pocket. The witness had previously seen defendant with a survival knife with a 6½ to 7 inch blade hanging from his belt. When defendant was taken into custody he volunteered the statement that he had taken the woman's car but had not killed her. According to the arresting officer he had not advised the defendant that a woman had been killed prior to the volunteered statement. There was evidence however that defendant was aware he had been charged in Tennessee on a murder warrant. The victim's wallet was found wrapped in a thermal underwear shirt a short distance from where her car was found abandoned. The key to Room 9 of the CeBon Motel was found at the site where defendant had been camping out near Cave City, Kentucky. When asked by a TBI agent to tell the truth about the death of Katherine Jenkins[,] defendant stated that if the officer could guarantee him the death penalty he would confess and tell him all about the murder and that he could tell him everything he wanted to know if he was of a mind to. There were marks on the wall of Room 9 at the CeBon Motel apparently made by someone stabbing a knife into the wall. When shown photographs of the marks on the wall defendant responded that they were knife marks. These marks

were obviously made by a knife larger than two taken from defendant at the time of his arrest.

There is additional evidence in the record incriminating defendant. That summarized above establishes guilt of the conviction offense. A criminal offense may be established exclusively by circumstantial evidence and the record in this case is abundantly sufficient for a rational trier of fact to find defendant's guilt beyond a reasonable doubt.

Hines, 758 S.W.2d at 517-19.

## B. Proof Presented at 1989 Resentencing

The following proof was presented during the resentencing and set out by the supreme court in affirming the petitioner's death sentence:

The State introduced proof that the defendant had previously been convicted of assault in the first degree. A detective who had investigated the case testified that the defendant had inflicted serious physical harm to the victim in this prior case. The State also presented proof that the defendant had stabbed the victim in the present case multiple times with a sharp instrument, probably a knife. Three of these wounds were lethal and had penetrated the victim's chest five to six inches. The pathologist who had performed the autopsy of the victim testified that all the lethal wounds were inflicted at about the same time and that death would have occurred within four to six minutes, most of which time the victim would have remained conscious. Defensive wounds were found on the victim's hands. Her clothing had been pulled up and her panties had been cut in half and removed from her body. About the time of death, and shortly after the infliction of the lethal wounds to the chest, the defendant had inserted a flat object through the victim's vaginal orifice into the vaginal pouch until the instrument penetrated the vaginal dome and passed into the abdominal cavity. A twenty dollar bill had been placed under the victim's watchband. No semen or any other evidence of ejaculation was found.

At the time of her death, the victim had in her possession a bank bag containing approximately $100 in proceeds from the motel. The empty bag was discovered in the room where the victim's body was found. The victim's automobile was also missing. Around 12:40 p.m. the day of the murder, another employee of the motel saw the

vehicle being driven out of the motel parking lot by someone other than the victim.

In mitigation, the defendant presented proof that, while in prison on this conviction, he had presented no serious disciplinary problems and posed no threat to the prison population. The defendant also presented proof of a troubled childhood. His father had abandoned the family when the defendant was young. His mother had an alcohol problem. In his teens the defendant became involved in sniffing gasoline and glue and began to abuse alcohol and drugs. He also exhibited self-destructive behavior. Dr. Pamela Auble, a clinical psychologist, testified that the defendant was suffering from a paranoid personality disorder and dysthymia, or chronic depression. According to Dr. Auble, the defendant would suppress his feelings until they "boiled up" under stress. In her opinion, the defendant, who had returned from turbulent visits with his parents and girlfriend shortly before he committed the murder, was under stress when he killed the victim. Dr. Ann Marie Charvat, a sociologist, also testified about the damaging effect of the circumstances of his childhood on the defendant.

Hines, 919 S.W.2d at 577.

## C. Proof Presented at Post-Conviction Hearing

Witnesses testifying at the post-conviction hearings included Ken Jones, who testified at the petitioner's 1986 trial and 1989 resentencing hearing that he had found the victim's body; Marion Jones, Ken Jones's wife; and Vernedith White, his girlfriend. Neither Mrs. Jones nor Ms. White had testified previously in guilt or sentencing proceedings

Ken Jones testified via deposition from a nursing home in Hendersonville, Tennessee. In the years following the petitioner's resentencing, Jones suffered a stroke and was confined to a nursing home; therefore, he was unable to testify in person at the post-conviction hearing. He testified that he found the victim's body at the CeBon Motel. He acknowledged that he went to the motel on the day of the victim's murder to rent a room with Vernedith White, with whom he had been having an affair for two years, although at trial he had testified that his reason for being at the motel was to use the restroom. Jones explained that it had been his and Ms. White's custom to rent a room at the CeBon Motel most every Sunday. He usually rented a room from the victim, who was a maid at the motel. He recalled that, on the day in question, he and White had arrived at the motel between 10:00 and 11:00 a.m. Jones could not find anyone at the motel, so he and Ms. White sat in his van and waited for someone to arrive to rent them a room. They subsequently drove to a nearby restaurant and returned to the motel within fifteen minutes. Jones said that he could see the motel parking lot the entire time he was at the restaurant and never got out of his car while at the restaurant. He said

that he found the victim's body within one hour of the time they arrived at the motel. Jones further testified he knew that keys were kept in a box outside the office, so after no one showed up to rent them a room, he retrieved a key from the box.

Upon entering the motel room which had a maid's cart sitting outside, Jones saw the victim's body, immediately ran out of the room, drove across the street to a restaurant, and had someone call the sheriff. He could not recall exactly what he told the person at the restaurant about the victim. Thereafter, he drove Ms. White to her home in Dickson and returned to the motel to discuss his discovery with Sheriff Weakley, whom he said was a friend of his. He presumed that the sheriff knew why he was at the motel that day and admitted he told the sheriff that he was concerned about his wife finding out why he had been there. Jones testified that Sheriff Weakley tried to "put [him] at ease about the problem of being at the motel there with Vern[e]dith." When asked further about this issue, Jones said that he understood Sheriff Weakley would not question him about it. He also understood that none of the attorneys would question him about it, but remained nervous about testifying at the trial. He said that Sheriff Weakley called him the evening of the murder and asked him not to discuss it with anyone. Jones said that he was not contacted by any attorney prior to his testimony at trial, and his first contact with any attorney occurred when he was called to testify at the trial. Jones testified that he knew nothing concerning the actual murder itself. He stated that he did not see anyone at the motel that morning other than a woman who pulled into the parking lot in either a brown or maroon car. He could not recall testifying at trial that the woman left her car and knocked on the door of the room where he later found the victim.

Marion Jones, Ken Jones's wife, testified at the post-conviction hearing as to her husband's longstanding affair with Vernedith White. She did not remember exactly when she learned of the affair but knew of it by the time of the petitioner's trial in 1986. She and Ken Jones had been married since 1956, and he had been involved in several extramarital affairs. She testified that after Jones suffered a stroke and entered the nursing home, she learned that he had given power of attorney to Ms. White. She also discovered that he had given Ms. White approximately $30,000. She did not know that her husband had testified at the 1986 trial until Connie Westfall, an investigator with the post-conviction attorney's office, contacted her years later. She said that her husband had a temper and had been verbally abusive to her but had never hit her.

Vernedith White, Ken Jones's former girlfriend, testified at the post-conviction hearing that she had neither been called to testify at the 1986 trial nor been contacted by anyone for investigative purposes prior to the post-conviction proceedings. She acknowledged at the hearing that she had been involved in an affair with Ken Jones for eleven years and was at the CeBon Motel on the day Jones discovered the victim's body. Each week they rented one of two rooms, normally from the manager or the maid, and were usually at the motel from approximately 9:00 a.m. until 12:00 noon.

According to Ms. White, Ken Jones picked her up around 8:00 a.m. on Sunday, March 3, 1985, as was his custom. She lived in Dickson and estimated that they arrived at the motel around 9:00 a.m. They could not find anyone at the motel and waited in the parking lot. She suggested to Jones that they leave and go home or somewhere else instead of waiting, but he did not take her

advice. She remembered a woman pulling into the motel parking lot, but did not recall her leaving her vehicle and knocking on the door, as Jones had testified at the 1986 trial. She said they did not leave the motel parking lot to go to the restaurant as Jones had testified. After they had waited awhile at the motel, Jones told her he was going to get a room key from a dish in the office and they would just use the room and leave. Ms. White said that, after Jones returned to the van with a key to room 21, they drove over and parked in front of that room. Jones told her to wait in the van while he went to check the room. Ms. White testified that the curtains to the room were open, and she could see sheets on top of both beds. Jones walked in the room past the beds, saw the victim's body, and ran out of the room. She could see Jones the entire time he was in the room, which was "[n]ot even a minute." He was very scared when he ran out and told her there was a dead woman in the room. She wanted to go inside, but he would not let her. She said that Jones did not have any blood on him when he came out of the room and returned to the van. She believed that it was approximately 12:00 noon when Jones found the body. They immediately drove to the restaurant and called the sheriff. She was not sure if Jones or a woman at the restaurant actually placed the call. Informed that the emergency call had been made at 2:36 p.m, she said that she must have had her times wrong. Jones drove her home, which was an approximately forty-five-minute drive from the motel, and then returned to talk to the sheriff.

Ms. White testified that she and Mr. Jones had been together at the CeBon Motel on at least 100 occasions prior to March 3, 1985, but they had never before retrieved a key in the manner they did that day. She could not recall if Jones returned the key to room 21. Although she had seen the victim cleaning rooms at the motel on prior occasions, she did not know her name. She recalled that the day of the murder was a warm day, and she and Mr. Jones sat in the parking lot with the van doors open. They neither saw nor heard any suspicious activity at the motel that day prior to Mr. Jones discovering the victim's body. She believed they would have seen anyone who entered or left either room 21 or room 9.

Ms. White said that she and Mr. Jones were co-owners of a sporting goods store and that Sheriff Weakley was a regular customer. She testified that she never discussed the events of March 3, 1985, with Weakley and understood that he had told Jones that it was all right for him to take White home and then return to discuss the matter. She said that her relationship with Jones had ended about two years after March 3, 1985. According to Ms. White, there was no possibility that Ken Jones had anything to do with the victim's murder.

Sandra Kilgore testified that she served on the jury in the petitioner's 1986 trial. After learning that she had been selected for a jury, she called her pastor from home and asked for biblical scriptures regarding capital punishment. She said that she spoke to her pastor before she was sworn in as a juror in the petitioner's trial. She did not know that the State was seeking the death penalty in the petitioner's case until she came to court for jury service. According to Ms. Kilgore, there was some division among the jurors during deliberation.

Mary Sizemore of the Cheatham County Ambulance Service testified she and her partner went to the CeBon Motel in response to a call from someone at the Donnell Restaurant about a

stabbing at the motel. Ms. Sizemore and her partner searched room to room until they came to a room with a maid cart outside. Her partner indicated that the room was open. They entered the room and found the victim lying on her back wrapped in what appeared to be a bedspread up to her neck. The victim's wounds were not readily apparent, and they had to unwrap her and pull up her dress to actually see the wounds. They were not able to find a pulse on the victim. Ms. Sizemore remembered that the man who had reported the stabbing subsequently returned to the scene and talked with the sheriff. She later learned that this man was Ken Jones.

Maxey Jean Kittrell testified that she was working at the CeBon Restaurant on March 3, 1985, when a man came in and reported a stabbing at the CeBon Motel. She called an ambulance service and reported the stabbing.

J. Kenneth Atkins, one of the prosecutors in the petitioner's original trial in 1986, testified that he was involved both in the preparation for trial and the trial itself. He denied that Sheriff Weakley had asked him not to question Ken Jones regarding his reason for being at the CeBon Motel on the day of the murder, but acknowledged knowing that Jones was at the motel with a woman other than his wife and that Sheriff Weakley was concerned about embarrassing Jones. Atkins said that he had known Jones prior to his involvement in the petitioner's case because he had "prosecuted a guy that sold drugs and resulted in [Jones's] son's death." He testified that Jones did not express any reservation about testifying at the petitioner's trial, and Sheriff Weakley never asked him to limit his questioning of Jones. Atkins acknowledged that he did not interview Vernedith White. In his opinion, trial counsel were not deficient in their representation of the petitioner.

James W. Kirby, a former assistant district attorney general and, at the time of the post-conviction hearing, the Executive Director of the Tennessee District Attorneys' General Conference, testified that he was involved in prosecuting the petitioner at the 1986 trial. He said that Atkins was the prosecutor who talked with Ken Jones and examined him on the witness stand. Kirby acknowledged that he was present at the deposition of Jones taken prior to the post-conviction hearing and had briefly discussed it with Atkins. He said that the deposition contained testimony that was not brought out at the 1986 trial. He did not recall having any discussions with Sheriff Weakley prior to the petitioner's trial, but it was his understanding that Atkins recalled discussing Jones's situation with Sheriff Weakley. Kirby also testified that in the 1980s most of the juries he was involved with in Cheatham County were dominated by men; however, he recalled one death penalty case where the jury had a female foreperson.

Robert S. Wilson was the first attorney appointed to represent the petitioner, but his representation was short-lived because he was hired by the district attorney general's office approximately two months after his appointment. He said that he represented the petitioner from shortly after his arrest in March 1985 to approximately late June 1985. He began employment with the district attorney general's office on August 16, 1985, and said that he never discussed the case with anyone at that office. He testified that he had recommended Steve Stack as his co-counsel, and Stack was appointed. He knew that Stack had no prior death penalty experience when he recommended him.

Steve Stack represented the petitioner at the 1986 trial and the 1989 resentencing. He had tried two cases to a jury in the twenty months that he had been practicing law prior to his appointment and did not believe he was qualified to serve as lead counsel on the case. Stack estimated that between 60 and 75% of his practice at the time was civil. William Wilkinson was appointed to assist Stack after Wilson was allowed to withdraw. Wilkinson had practiced with Wilson prior to the time he joined the district attorney general's office. Stack considered himself to be co-counsel in the case, although he performed many of the lead counsel's duties. He spent 38.9 in-court hours and 133.6 out-of-court hours on the petitioner's case. He believed he was paid, at the time of his representation of the petitioner at the trial, $20 an hour for out-of-court time and $30 an hour for in-court time. By contrast, in retained cases he charged between $60 and $75 per hour for his services. At the time of his representation of the petitioner, he did not have an office staff or an investigator. Accordingly, he and Wilkinson did all of the investigation themselves. Although Stack was in private practice during the 1986 trial, he was employed at the public defender's office by the time the case was remanded by the supreme court for resentencing and, as a public defender, was appointed to represent the petitioner at the resentencing.

Stack testified that he obtained a mental evaluation for the petitioner to determine competency issues and whether an insanity defense would be available prior to the original trial, but these services did not cover any mitigation issues. He requested the services of an independent psychiatrist, a private investigator, and an independent mental evaluation, but these requests were denied.

Stack said that he had interviewed many of the witnesses who testified at trial, including the owners of the motel and Sheriff Weakley. He recalled traveling to Bowling Green, Kentucky, but could not remember the specific witnesses he interviewed there. He did not run a criminal background check on Daniel Blair and, therefore, did not know he had been convicted of theft of livestock, which might have been used for impeachment purposes. He also interviewed Bill Hines, the petitioner's stepfather; Bobby Joe Hines, the petitioner's half-brother; and possibly Barbara Hines, the petitioner's mother. Although he recalled traveling to the home of Victoria Hines Daniel, the petitioner's sister, he did not remember actually meeting with her. He acknowledged that he knew she would testify that she saw blood on the petitioner's clothing, but he did not obtain any information to impeach her testimony. He did not interview the petitioner's former girlfriend, Melanie Chandler, or her mother, Virginia Chandler, both of whom lived in North Carolina.

Stack acknowledged that he did not present all of the mitigation proof that the post-conviction defender had been able to assemble. He pointed out, however, that at the time of the trial and resentencing, he did not have the benefit, apparently referring to counsel representing the petitioner at the post-conviction hearing, of a three-year period of time to investigate the case as well as numerous attorneys and investigators to work on the mitigation proof. He testified that, as an appointed attorney, he did not have the benefit of working on the case as much as he would have liked because he could not afford to do so. However, he felt he had zealously represented the petitioner.

Stack also testified that the defense did not challenge the composition of the jury venire at either the 1986 trial or the 1989 resentencing, saying that it was not considered as an issue at the original trial. Although he was aware that it may have been an issue at the time of the resentencing, they did not have the necessary time to devote to pursuing it.

Stack said that he did not interview Ken Jones prior to the trial because he had been told by Sheriff Weakley that Jones was at the crime scene for only a very short period of time and did not know anything about the murder itself. Stack testified that he knew at the time of trial that part of Ken Jones's testimony was false or inaccurate. However, he explained that he held Sheriff Weakley in high regard and trusted what he had told him, saying: "I mean, I would take that man's word for anything in the world. He say[]s this hadn't got a dog in the hunt, don't embarrass the man. I wasn't going to embarrass the man." Stack acknowledged that the defense team should have interviewed Jones and that it was "ridiculous for [them] not to have gone to interview him." He said there were discrepancies in Jones's testimony regarding his timing of the events which should have been discovered and developed for the defense. Stack acknowledged that Jones testified at trial that he did not know the gender of the victim at the time of discovery because the victim's body was covered with a cloth or sheet. However, the person who made the emergency call said that a woman had been stabbed.

Stack testified that he became an assistant public defender in 1988 and was appointed to represent the petitioner at resentencing, as were Shipp Weems, the public defender, and Phillip Maxey. As for the defense team's decision to delay their opening statement at resentencing until just prior to their proof, Stack testified that they discussed this issue, but he did not know why they decided to do so. He said that Maxey, who was the least experienced of the three, gave the opening statement for the defense, and both he and Weems had anticipated a different opening. He testified that the opening did not outline the proof they planned to present, but rather simply asked the jury to listen to their proof. He testified that the defense team made the tactical decision not to present a closing argument because it was their opinion that General Kirby had not "presented a very forceful argument," and they wanted to prevent General Atkins, who was "exceptional in his ability to . . . bring emotions out in a jury," from making a rebuttal argument. Stack said that General Atkins had given a very impassioned closing argument at the original trial, and they wanted to keep him from doing so at the resentencing.

Stack recounted that at resentencing they called Dr. Pamela Auble and Dr. Ann Marie Charvat to testify for mitigation purposes. The two had been recommended by the Capital Case Resource Center, with whom defense counsel worked during the resentencing, and he believed they could explain how the petitioner had become the person he was. Dr. Charvat did not come across as well as they had hoped, and he did not believe the jury had grasped everything she said. Stack said that the defense team did not know the "extent and the nature of the types of abuse that [the petitioner] went through growing up" and that the resentencing jury never saw the background that the petitioner had. Stack further acknowledged that they did not attempt to challenge the petitioner's prior felony conviction in Kentucky because of the time constraints. He concluded that the public

defender's office did not have, and still does not have, the sufficient resources or the time to devote to a capital case.

William G. Wilkinson, who had been practicing law since 1968, testified that he was appointed to assist Steve Stack, who had been in practice a "relatively short time." Wilkinson described his role as "kind of senior counsel" but said that Stack probably did more work on the case than he did. He said he had billed 59.5 out-of-court hours and 34.4 in-court hours on the petitioner's case, but those numbers were very conservative and did not include time he spent traveling to Bowling Green, Kentucky. Wilkinson testified that he believed he had sufficient time to prepare for the petitioner's trial, that he was adequately prepared for trial, and that none of his tactical decisions turned out to be erroneous.

Wilkinson knew that the petitioner's sister, Victoria Hines Daniel, had an alcohol and drug abuse problem and recalled examining her husband, Ernest Daniel, about her drinking problem. He was not aware of any sexual or physical abuse allegations of Mrs. Daniel but acknowledged that information as to this would have been useful. Wilkinson said that the petitioner "may" have told him about the abuse inflicted upon him by his stepfather. He had the petitioner examined by a psychiatrist who determined he was competent to stand trial.

Wilkinson said he did not interview the four people from Kentucky who gave the petitioner a ride and did not know before trial that one of them, Daniel Blair, was going to testify that he saw blood on the petitioner's shirt. Had he known of the substance of Blair's testimony, he would have checked Blair's criminal record for impeachment purposes. He recalled that Blair testified about his ability to recognize blood and about washing bloodstains out of fabric although he could not recall Blair's exact testimony. He acknowledged that, in hindsight, it would have been helpful to have had an expert refute Blair's testimony about washing out bloodstains.

Wilkinson said that he discussed Ken Jones's situation with Sheriff Weakley and believed that Weakley had told him everything he knew. He did not interview Ken Jones, Vernedith White, or Virginia Chandler and, in hindsight, would liked to have had more time to inquire about why Jones and White sat in front of the CeBon Motel for over three hours on the day of the murder. As for Dr. Harlan's testimony, Wilkinson said that it may have been helpful to have had another pathologist review Harlan's findings.

Regarding the petitioner's jury, Wilkinson said that three women, two of whom he knew, served on the jury and he believed he had adequately prepared for the jury selection. He was not aware of any disparity between the number of women available and the number actually called to serve in Cheatham County. He was aware of some Tennessee case law prior to 1985 where challenges had been made to jury composition based on race or gender.

Shipp Weems was the District Public Defender for the Twenty-Third Judicial District, which included Cheatham County, at the time of resentencing and in that capacity had been appointed to represent the petitioner at resentencing. He was not involved in the preparation phase of

resentencing but assisted in voir dire. Weems confirmed Stack's testimony that they agreed to waive closing argument at resentencing in order to prevent the prosecution from giving a rebuttal argument. He had tried six or seven capital cases prior to the petitioner's resentencing and was aware of the importance of mitigation proof. In hindsight, he felt that much more work should have been done on the petitioner's social history for purposes of mitigation. As to the workload of the public defender's office in 1989, Weems said that the office had three attorneys who each handled approximately 800 cases. Although the office was budgeted to have an investigator, that position was filled by an attorney because the office was only budgeted to have two attorneys, and that number could not handle the entire district. In his opinion, at the time of the petitioner's resentencing, the attorneys in that public defender's office "didn't have the luxury to prepare a misdemeanor case much less a capital case." Weems testified that they were "looking for women" when choosing the jury for resentencing, and concluded that the defense team did not get the jury pool they wanted for the resentencing.

Phillip Maxey, a juvenile court judge at the time of the post-conviction hearing, had been appointed to represent the petitioner at resentencing. At the time, he had been practicing for about five years. Although he had taken several cases to trial, he "knew very little" about capital case representation at the penalty phase. He testified that he interviewed Sheriff Weakley, the investigating officers, and a juvenile court judge in Bowling Green, Kentucky. He also worked with Drs. Auble and Charvat and the Capital Case Resource Center. He said that the defense team was as prepared as they could have been and that they had been able to negotiate two life sentences for the petitioner, which were denied. He believed they had presented strong mitigation proof and said they waived closing argument in an effort to prevent the State from making a rebuttal argument. They believed that the State would wait until rebuttal to "really throw it all" at the jury. He did not recall any discussions about challenging the jury venire.

Daniel Blair, who testified at the petitioner's original trial, was one of the four people from Kentucky who picked up the petitioner on March 3, 1985, on Interstate 65, after they noticed his car was disabled, and drove him to Bowling Green, Kentucky. Blair was on probation at the time and was not supposed to have left the State of Kentucky, although he was never charged with violating his probation and was told by a Kentucky deputy sheriff that his leaving the state would not be a problem. At the post-conviction hearing, Blair testified that he had seen "what looked like blood" on the petitioner's shirt, although at the trial he had testified that it was blood.

Melanie Chandler, the former girlfriend of the petitioner and a friend of Victoria Hines Daniel, his sister, testified that she and the petitioner had a child, Anthony Scott Hines, who was born January 1, 1981. The petitioner's mother adopted the child when he was two years old. She testified she had last seen the petitioner around February 1985 when he came to her house in North Carolina. When he arrived, he only had a few items with him, one of which was a small, folding knife she previously had given him. During his visit, they went to a party with some friends of hers, and, as they were returning home, the petitioner and the friend who was driving got into an argument. After the petitioner grabbed the friend who was driving the car, Chandler grabbed the petitioner, who accidentally struck her in the eye, causing bruising. She said that he had never before

struck her but had always been protective. Chandler's mother, Virginia Chandler, called the police and forced the petitioner to leave. Later that night, the petitioner appeared at Melanie's window. She allowed him inside, and he hid in her closet for approximately one week before her mother discovered him. Her mother bought the petitioner a one-way bus ticket to Kentucky.

Chandler said that she knew her mother had testified at the petitioner's trial, but defense counsel never contacted her. She acknowledged knowing she was supposed to appear in court at the trial, but she had just had a baby and decided not to do so. She testified that she did not know that the petitioner was on trial for murder. She thought her mother lied at the trial when she stated that she had seen the petitioner sharpening his knife with a bootstrap. She said that her mother later told her that the petitioner had been found guilty of murder and had been executed. She believed the petitioner was dead until the post-conviction defender's office contacted her in 1997 or 1998. Since learning that the petitioner was alive and in prison, she had written him several letters and had visited him in prison.

Robert Ernest Daniel testified that he had been married to Victoria Hines, the petitioner's sister, for about two years. He met the petitioner while the petitioner was on parole in Kentucky and gave him a job doing construction work. The petitioner was a hard worker, and they were friends "[t]o a point." Daniel said that the petitioner carried a small pocketknife with him on the job and also had an "Army type survivor" knife with a fixed blade. He believed that the knife blade was approximately six inches long, with one end serrated and the other sharp. He recalled that the petitioner gave the knife to his brother, Bobby Joe, who kept it in a drawer at their home.

Daniel testified that on March 3, 1985, the petitioner appeared at his apartment, wearing blue jeans, a white t-shirt, an Army jacket, and white tennis shoes. Victoria's birthday was the day before or the day after the petitioner arrived, and the petitioner wanted to buy a grill for her. Daniel gave the petitioner some money because the petitioner did not have enough to purchase the grill. He then drove the petitioner to Park City or Cave City, Kentucky, and dropped him off. Later that night, the police came to his home and questioned him about the petitioner's whereabouts. At the time, he thought the police wanted to question the petitioner about a probation violation, so he "acted stupid." When he later learned that the police wanted to question the petitioner in connection with a murder, he told the police where he had taken the petitioner.

On cross-examination, Daniel said that he testified at the original trial that Victoria only drank occasionally "because she was my wife at the time and I would be very protective of her." This testimony was inaccurate because Victoria drank heavily. He denied testifying that the petitioner had something bulky in his Army jacket and that he did not know when Victoria's birthday was. He denied remembering seeing the petitioner with a set of car keys or that he had asked the petitioner why he had a Volvo. During a recess, the court ordered Daniel to take a breath alcohol test. Daniel admitted that he had consumed "a couple of beers" before coming to testify at the post-conviction hearing, and the court found him to be in contempt, ordering him to serve twenty-four hours in the Cheatham County Jail.

-14-

Victoria Hines Daniel Furlong, the petitioner's sister, testified at both the original trial and the post-conviction proceeding. She said that her stepfather, Bill Hines, was abusive to her, her siblings, and her mother. Her stepfather used "tobacco sticks, belts, belt buckles . . . anything that he could get a hold of to whoop us with." He also drank beer and liquor "all the time" which caused his attitude to change, and the "beatings got worse." She said that the petitioner often attempted to intervene to protect her and their sister, Debbie, which caused the petitioner to be beaten more severely. She recalled one incident where her stepfather knocked the petitioner into the corner of a fireplace, rendering him unconscious. However, medical attention was not sought for the petitioner. Often there was not much food in the house. In addition to the physical abuse, Bill Hines sexually abused her from the age of nine. She and the petitioner began drinking at the age of eleven or twelve. They both also smoked "dope," and the petitioner sniffed glue. She admitted that she drank heavily from the time she was twelve or thirteen and had only recently stopped drinking. She also said that she was married to Ernest Daniel for five years, during which time he often beat her severely.

Furlong said that her birthday was February 4 and that on March 3, 1985, the petitioner had given her a grill as a belated birthday gift. She said that, if she had testified at the original trial that she saw blood on the petitioner on March 3, 1985, when he arrived at her house, it was because she had been drinking. At the post-conviction proceeding, she testified that the petitioner had fallen in red clay mud prior to arriving at her house and that is what she saw on his clothes. She said she was not interviewed by the petitioner's attorneys prior to the resentencing, and the prosecutors had tricked her into talking to them prior to the original trial by telling her they were the petitioner's attorneys. She said she was drinking whiskey and water when they came to her house and asked questions. She thought they were tape-recording their conversation, but they denied it. She said she later saw a recording device and ordered the men out of her home.

Furlong acknowledged that she was an alcoholic. She did not remember testifying that the petitioner had gotten into a struggle at the motel and did not believe that she had testified as the transcript of the original trial reflected. If the transcript were correct, then she was "[p]robably" lying in 1986 because of her drinking. She admitted that she had never reported any of the sexual abuse by her stepfather. It was her understanding that her stepfather had continued with his sexual abuse of young girls, including her niece, but she had never reported him to law enforcement officials.

Lee David Miles testified at the post-conviction hearing that he is a transsexual and formerly had been the petitioner's oldest sister, Debbie Hines. According to Miles, the petitioner and Bill Hines were very close until the petitioner was approximately age six and learned that Bill Hines was not his biological father. At that time, the petitioner became resentful toward Bill Hines. Miles saw Bill Hines hit the petitioner with his hands, a belt, a tobacco stick, and a car antenna. Hines beat the petitioner "four or five times a week." Miles related one incident where Bill Hines threw the petitioner, who could not swim, into a partially frozen pond as punishment for throwing tires in the pond. An uncle and Miles had to go in after the petitioner, and Miles pulled him out. Miles also testified that their stepfather got mad at Miles for breaking an antenna off his car. He beat Miles,

-15-

Furlong, and the petitioner with the antenna to the point that he drew blood. Miles further testified that the petitioner once fell off a stack of hay bales on top of a wagon. He hit his head on the ground and was bleeding, but Bill Hines refused to take him to the doctor. Miles also testified that the petitioner was very protective of his siblings and often intervened during Bill Hines's attacks and abuse. Bill Hines also shot and killed the family dog and her puppies in front of the children.

Miles also testified that Bill Hines sexually abused him four to five times a week from the age of six until the age of eighteen and that he was a female at the time the sexual abuse occurred. Miles also said that he was raped at the age of sixteen by Bill Hines and that Hines tried to force him to have sex with a friend of his, but Miles "fought with his friend for a while and then his friend got tired and said well I am not going to do this, let's just leave."

Miles said that when the family moved to Bowling Green, Kentucky, the petitioner and Victoria began drinking heavily and the petitioner also began sniffing glue and gasoline and smoking marijuana. The children often ate cereal with water for all three meals because their parents spent their money on beer and cigarettes. However, Bill Hines bought food for Bobby Joe Hines because he was his biological son. Miles never saw Bill Hines strike Bobby Joe. Miles recalled visiting the petitioner at the Green River Boys Camp and the petitioner cried and begged their mother to take him home, but their stepfather refused to let her. After their mother attempted suicide, she left with only Bobby Joe and moved to Illinois. Soon thereafter, Miles left home also. Their mother subsequently returned home after learning that Miles had left. Miles testified that he was never contacted by the defense attorneys, but he tried to contact them to offer to pay their fees.

Connie Westfall, an investigator in the post-conviction defender's office, said that she met with the Hines family and that it took them a "great deal of time" to open up to her. Ms. Westfall estimated that she worked more than 1000 hours on the petitioner's case.

Dr. Pamela Auble, a psychologist specializing in clinical neuropsychology, who had testified at the resentencing, testified also at the post-conviction hearing, saying she first evaluated the petitioner in May 1989. After meeting with the petitioner, she reviewed his social history, as well as his school records, prison records, and records from the Middle Tennessee Mental Health Institute which were provided by defense counsel. Her diagnosis of the petitioner was paranoid personality disorder and dystonia, which is depression.

Dr. Auble said that she did not have enough time prior to the resentencing hearing to develop a trusting relationship with the petitioner. She said she was only given a little over a month to work on the petitioner's case but that, in general, three to four months was optimal, depending on the case. It would have been helpful to have had the petitioner evaluated by an expert in chemical dependency and to have had more information about his social history. She acknowledged that, at the time of resentencing, she knew little about the petitioner's alcohol abuse or the sexual abuse in his family. She testified that Steve Stack "didn't seem very confident in his own abilities," and she believed defense counsel did not have much understanding of the mental health issues in the case.

On cross-examination, Dr. Auble acknowledged that she knew the petitioner's parents drank when they were not at work, suspected that he had suffered physical abuse, and knew that he abused alcohol and drugs. She said she was not aware of the alcoholism in the petitioner's family or of the extent of the abuse suffered by the Hines children. She believed her diagnosis of the petitioner's emotional problems, of which she testified at the resentencing hearing, was correct. She said that she would liked to have referred the petitioner to an expert on the issue of addiction, such an expert being needed to determine the extent and nature of the alcoholism and drug abuse and the effects these had on the petitioner. She explained that the combination of the history of addiction in the petitioner's family that she now had knowledge of, together with his relatively normal neuropsychological testing, raised the issue that the petitioner may have a "chemical lack of neurotransmitter substance." Dr. Auble said that this was one area of her testimony that would have been different had she had additional time to work on the petitioner's case.

Dr. Ann Marie Charvat, a sociologist and a mitigation specialist, also testified at the petitioner's resentencing hearing and again at the post-conviction hearing, the former being the first capital case on which she had worked. Her first involvement with the petitioner's case was on May 10, 1989, "just a matter of days" after receiving her PhD. Dr. Charvat interviewed the petitioner, several of his family members, and several of his friends prior to the resentencing. She did not obtain any medical records on any of the family members. The petitioner told Dr. Charvat about the physical abuse he and his sisters endured, and she learned of the petitioner's alcohol and drug abuse. Dr. Charvat was not told about the sexual abuse, but she suspected that it had occurred. She said that information about the sexual abuse and the fact that the petitioner tried to be his sisters' protector were important for purposes of mitigation. Asked if she had overlooked anything in her evaluation of the petitioner, Dr. Charvat said that she had "failed to look at certain factors . . . which include family history, medical records. . . . I would have collected more records. I believe that I did identify that his bond to society had suffered. I failed to tie it to the crime. There are a number of things to investigate that . . . I hadn't."

Dr. Charvat testified, as she had done at resentencing, regarding the petitioner's confinement at Green River Boys Camp in Kentucky, where a method of behavior modification known as grouping was used. The groupings often became physically and verbally abusive. She explained that the bad behavior of one boy in the group caused the entire group to lose privileges. Dr. Charvat testified at resentencing about one incident at Green River where the petitioner and another boy were pushed into sewage. She said that she was aware in 1989, the time of resentencing, that programs using grouping had extensive problems and that there was literature available on this issue. She explained that although the activities and potential abuse at Green River, as they related to the petitioner, could have been extremely important for mitigation purposes, she did not have enough time to further develop those issues.

Dr. Charvat said that she still agreed with the sociological conclusions that were presented to the jury at the resentencing. She believed the weakness was in the way they were presented to the jury and said that "there were many parts of [her testimony] that . . . were not well articulated, not

-17-

clear." It was also her opinion that the petitioner's background was not adequately distinguished from that of any other unruly child.

Dr. William Kenner, a psychiatrist, testified that the petitioner suffered from post-traumatic stress disorder ("PTSD"), antisocial personality disorder, status post-head injury, and inhalant abuse. He said that the petitioner was sexually abused by both his stepfather and a maternal uncle and physically abused by his stepfather, opining that the abuse caused the petitioner's PTSD. The physical abuse inflicted upon the petitioner by his stepfather included hitting him in the head with a tobacco stick, whipping him with car radio antennas, throwing him into a pond although he could not swim, and shooting the family dog and her puppies in front of him and his siblings. The petitioner's mother was also a victim of Bill Hines's abuse, and the petitioner often tried to protect her. At the age of eight or nine, the petitioner sustained a head injury when he fell off a wagon of hay and was knocked unconscious. The petitioner did not receive any medical treatment for this injury.

Explaining how PTSD affects the brain, Dr. Kenner said that a person with PTSD repeats or replays traumatic events throughout life and that PTSD can alter a person's character and change his or her behavior. Dr. Kenner testified that in the petitioner, PTSD created a paranoid quality. Dr. Kenner opined that the head injuries the petitioner suffered throughout his life could have caused organic personality syndrome, which made him even more volatile and difficult to manage. The petitioner's abuse of inhalants such as glue and gasoline also caused damage to his brain. Dr. Kenner concluded that the petitioner's choosing a woman for his victim was inconsistent with the petitioner's personal history, as there was no indication that he had hard feelings toward women.

On cross-examination, Dr. Kenner acknowledged that the petitioner had been in and out of jail since the age of fifteen. He further acknowledged that a report prepared by the Middle Tennessee Health Institute and the Harriet Comb Mental Health Center indicated that the petitioner experienced difficulty in relationships with women, as the result of problems with girlfriends and family interference, exhibited a preoccupation with thoughts of violence, and displayed extreme prejudice toward African-Americans. Additionally, a report prepared by the Tennessee Department of Correction stated that the petitioner, once confined on death row, acknowledged to security personnel that he hated both women and African-Americans. Dr. Kenner testified that although the petitioner said that he hated women, he did not believe him because his behavior indicated differently. He said he had much more information concerning the petitioner than Dr. Charvat did prior to preparing her report for the resentencing. He believed that Dr. Charvat should have interviewed the petitioner's sisters and mother in order to get a true picture of "how bad things were for [the petitioner] growing up."

Dr. Murry Wilton Smith, a specialist in addiction medicine, testified that the petitioner is a Type II alcoholic. He explained that Type II alcoholism, a primary medical illness based in brain chemistry, is inherited and involves rapid early onset of alcoholism, usually between the ages of nine and twelve, and is associated with antisocial behavior and early legal trouble. Dr. Smith also testified that the petitioner had used inhalant solvents and marijuana. He was aware of the

petitioner's low levels of serotonin, which is associated with violent behavior and Type II alcoholism. He said that current treatment for Type II alcoholism, which was not available in 1989, consisted of alcohol and drug treatment, intensive physiotherapy with a counselor, and medication to improve the serotonin level. On recross examination, Dr. Smith acknowledged that although medications to increase serotonin levels were available in 1986, there was not a routine to monitor. He also stated that a characteristic of Type II alcoholics is a lack of motivation to follow instructions or a schedule.

Dr. Paul Rossby, an expert in molecular neurobiology and the study of serotonin, testified that, as a molecular biologist, he studies the chemistry of the brain and the biological basis of behavior. According to Dr. Rossby, serotonin blocks pain and orchestrates inhibition within the brain. Dr. Rossby testified that research of serotonin dated back to at least the 1970s. He further said that there would have been a "tremendous amount" of literature available on serotonin at the time of the petitioner's resentencing in 1989 and a "great deal" of literature available at the time of the petitioner's trial in 1986. He said that low levels of serotonin have been associated with impulsive behavior, but none of the studies has indicated that it causes violence.

Dr. Rossby had a spinal tap performed on the petitioner to determine his serotonin levels, which were "at the extreme low level" of the normal male population. He opined that the petitioner's serotonin levels, coupled with his Type II alcoholism, resulted in the petitioner's being organically impaired and said that the petitioner does not have the biological capacity to control his impulsive behavior. Dr. Rossby said that in a person with low levels of serotonin, once an impulse is triggered, there is no ability to control the impulse. He acknowledged that he did not testify on the issue of serotonin levels until 1999. He first worked on a case involving a serotonin defense in approximately 1992, and was not aware of any expert who had testified on the issue of serotonin prior to the time he was involved with his first case.

Dr. Henry Cellini, an educational psychologist who was offered as a rebuttal witness on behalf of the State, testified that serotonin research began in the 1970s but had only been fully developed in the last fifteen to twenty years. With regard to the petitioner's case, Dr. Cellini testified that the practical application of serotonin levels to behavior was in its "infancy" in the mid-1980s. He said that research indicates that the two primary factors of antisocial personality disorder are impulsive aggression and psychopathic tendencies or thinking.

Two witnesses were presented as to the claims regarding the Green River Boys Camp in Kentucky and its alleged effects on the petitioner. Tammy Kennedy, an investigator with the post-conviction defender's office, said that she interviewed former residents and staff members. The former residents told her that, when they arrived at camp, they were immediately subjected to grouping, which consisted of several boys surrounding the new resident and physically and verbally abusing him. She said that the former residents told her at times they had sewage detail, which involved two boys holding a resident by the legs and dumping him into the sewage. They were forced to scrub the pavement until their brushes were gone and their hands were blistered. A juvenile specialist who had visited Green River advised Ms. Kennedy that schooling was minimal

and that there were reports of physical, sexual, and verbal abuse of the residents. Ms. Kennedy said that several other death row inmates were former residents of Green River.

Dr. David Richart, an expert in the operation of the juvenile justice system and residential treatment facilities in Kentucky, testified that he had investigated Green River in connection with his position as the Executive Director of Kentucky Youth Advocates, Inc. He said that the theory behind creating the juvenile camps was to take youthful offenders out of large, training school facilities and place them in smaller, community-like settings where they would both work and receive therapy consisting of guided group interaction, positive peer culture, and reality therapy. These theories of treatment were based on the fact that juveniles who committed crimes did so for peer-related reasons. The purpose of the therapy was "to turn something negative into something positive." However, problems arose when the state reduced the number of employees, which resulted in the staff allowing the residents to discipline themselves. Dr. Richart's investigation also revealed that the staff had not received the essential training required for this type of "sophisticated treatment."

Dr. Richart testified that new residents at Green River were first greeted by a group of fifty to sixty boys who encircled the new resident, screaming at and intimidating him. Because the group would surround the new resident so tightly that the staff could not see "what was going on below shoulder height," the new resident was often physically assaulted as well. Dr. Richart explained that residents at Green River were subjected to "grouping" for simple reasons, such as not having a good opinion of themselves or taking an extra packet of sugar at lunch. After becoming convinced that the residents were being harmed "as a result of using these very controversial emotionally and psychologically harassing techniques," Dr. Richart became concerned about the youths' psychological state and the damage that might occur. He recalled having to transport some youths to mental institutions because they experienced "psychotic breaks" while at camp. Dr. Richart said that Green River had compounded the youths' feelings of isolation and had done nothing to contribute to pro-social behavior, and he was not surprised to learn that many of them subsequently went to prison.

In Dr. Richart's opinion, the petitioner's six and one-half months at Green River intensified his criminal tendencies, exacerbated his antisocial tendencies, and made him see the world as a hostile place. Dr. Richart also believed that the petitioner was completely inappropriate for grouping, "because he just wasn't the kind of person that wanted to talk about his family." Referring to the treatment at Green River as "psychological torture," Dr. Richart opined that it was "probably the worst experience of [the petitioner's] life."

On cross-examination, Dr. Richart acknowledged that some juveniles may have benefitted from Green River and that residents, including the petitioner who had a substance abuse problem prior to going to Green River, would not have had access to drugs or alcohol while there. Dr. Richart read into evidence some of the staff's reports on the petitioner, which characterized him as easily agitated and having a bad temper but also as a capable person, a good worker, and "fairly consistent in his supportive leadership in the group."

Dr. Chris Sperry, the Chief Medical Examiner for the State of Georgia, testified concerning the number and location of stab wounds found on the victim. He had reviewed the victim's autopsy report, photographs of the crime scene, and witness reports of Mary Sizemore and Sheriff Weakley. He testified that there were pools of blood beneath the air conditioning unit and a spot where the victim's body was found, but none between those two areas. Due to the lack of blood in the room, Dr. Sperry concluded that the struggle was "very quick" and may have occurred in less than one minute. He also stated that all of the wounds, except the vaginal wound, were inflicted very rapidly. He opined that the victim remained conscious for about fifteen to thirty seconds following the stab to the heart. He explained that once she lost consciousness, she felt no pain; it was as if she were under anesthesia. As a result of the wounds to her heart, it was not possible for her to have been conscious for three or four minutes, contrary to Dr. Harlan's testimony. Dr. Sperry further estimated that the victim would have been dead, her heart would have stopped beating, between three and four minutes after she sustained the heart wounds. On cross-examination, Dr. Sperry acknowledged that the stab to the heart could have occurred last, and, if so, the victim could have been conscious until that time.

Dr. Sperry also testified that it was possible that the assailant had blood transferred onto his or her person because the victim had blood on the inside of her legs, and it appeared that someone with bloody hands had gripped her legs. It also appeared that the victim had been dragged to the area where her body was found, which would also have caused a transfer of blood from her to the assailant. He said that blood is difficult to wash out of clothing and that if someone committed a stabbing, washed off the blood, and then immediately got into a vehicle, there would usually be traces of blood transferred to the vehicle. Dr. Sperry testified that the wound to the victim's vagina occurred at or after the time of death. He said that the infliction of this type of wound was "an indicator of some kind of mental problem dealing with . . . women. Hatred or anger towards women." He also said that this type of injury was a "very specific expression of power of a female victim."

Dr. Charles W. Harlan, who performed the victim's autopsy, testified that he strongly disagreed with Dr. Sperry's opinion that the victim's attack and injuries occurred in less than one minute. He said that the victim lost 950 "cc's" of blood into her chest. He explained that the heart pumps between 25 and 30 "cc's" per heartbeat "under an optimum situation," but the stroke volume would be "gradually diminishing" because of blood squeezing the victim's heart, as the result of the wound, and the loss of blood itself. He further testified that an individual is usually conscious approximately 80% of the time that it takes to bleed to death. He believed that it would have taken considerably longer than thirty seconds to a minute for the victim to bleed to death, opining that "she probably lived a minimum of four to five minutes and that she would have been conscious for 80 percent of that time. It's possible that she lived longer than that, up to ten to fifteen minutes, but at least a minimum of four to five minutes." In his opinion, the victim's vaginal wound was inflicted at or near the time of her death, and there was no way to know for certain whether she was conscious at the time it was inflicted. Dr. Harlan acknowledged that Dr. Sperry had testified in contradiction to his testimony in nine cases, including the petitioner's case.

-21-

The proof at the post-conviction hearing on the issue of the jury venire consisted of five witnesses and a report prepared by a statistician, Dr. James M. O'Reilly, which concluded that there was an underrepresentation of women on the jury venire for Cheatham County for years 1979 to 1990. During the pertinent years, the female population of Cheatham County accounted for 50.6 to 50.7% of the total population. By contrast, the percentage of women in the Cheatham County venire was between 10 and 22%.

Connie Westfall, of the post-conviction defender's office, testified that she had investigated the issue of the composition of the jury pool at the petitioner's 1986 trial as well as his resentencing. At the time of her investigation, only one of the three jury commissioners for the relevant time period, C.E. Dunn, was able to meet with her. Dorris Winters, one of the commissioners, was deceased; and the other, Martha Adkisson, was confined to a nursing home and unable to be interviewed because of her mental condition. Dunn provided Westfall with an affidavit because he had suffered a stroke and was unable to travel to court. Basically, his affidavit stated that they used the voter registration list as the exclusive source of obtaining people for the purpose of filling the jury box, and the jury commissioners met every two years to fill the jury box. Ms. Westfall testified that she also interviewed Delores Moulton, Lloyd Harris, the tax assessor, and trustees. She said that when she first spoke with Mr. Harris, he recalled using the voter registration list and later remembered that they may have used property lists and the telephone book.

Dorothy Jones, the Cheatham County Trustee, said that she had been the trustee for six years at the time of the post-conviction hearing and, prior to her service as trustee, her husband was the trustee. She had worked in the trustee's office since 1982. During her years of employment in that office, no one ever had been allowed to remove the tax roll books from the office. She acknowledged, however, that the tax records were public records and anyone could come into the office and review them.

Betty Balthrop, the Cheatham County Property Assessor, said that she had occupied that position since 1988 and had worked in the office since 1978. Ms. Balthrop testified that since her employment in the assessor's office, no one had physically removed the tax records for the purpose of copying them. She acknowledged that the tax records were public records which exist in Nashville and elsewhere in the state.

Delores Moulton was the Cheatham County Circuit Court Clerk from 1990 to 1998. Previously, she served as the deputy clerk, beginning in 1972. Her father, Lloyd Harris, was the Cheatham County Circuit Court Clerk prior to her tenure. Ms. Moulton testified that the jury commissioners met every two years to charge the jury box and that the voter registration list was their major source of obtaining names because they had more access to it. She stated that they started out "randomly, maybe, every sixteenth one or twentieth one down and wr[o]te the name and address on a little jury ticket." She explained that each of the jury commissioners took a different section of the list and worked independently. While they were charging the box, the only names taken out were the names of those known to be deceased. She further explained that at the end of the two years, the names in the box were not removed, but new names were added.

After the jury box was charged, they gathered the jury list as needed. Either a child under the age of ten or Ms. Moulton, wearing a blindfold, picked the names out of the box. Ms. Moulton testified that the jury commissioners sat together while compiling the names. Names of deceased persons were discarded. If school was in session, schoolteachers' names were set aside. Students away at college were omitted from the list. Also, at times, if they knew a woman had just had a baby, they removed her name. They compiled a list of 150 or more names, which made up the sheriff's venire. The sheriff summoned these persons to court where each was assigned a number. The judge then drew twelve numbers out of a box, and those persons comprised the grand jury. Ms. Moulton testified that Dorris Weakley was the sheriff in 1986 and 1989. During his administration, only thirty to fifty prospective jurors out of 150 actually appeared in court as summoned, but the percentages increased drastically under the next sheriff's administration.

On cross-examination, Ms. Moulton testified that, in addition to the voter registration list, they also used the telephone book and tax records to randomly select names, although the voter registration list was the main source. She believed they followed the Tennessee statutes in gathering and preparing the jury venire. She said the commissioners "never discriminated anyone because of race, color, or nationality or men or women." She recalled that Martha Adkisson complained if she thought too many women were being put on the list; however, she believed Ms. Adkisson's reason for doing so was "to equal out . . . the men and the women."

Lloyd Harris, Delores Moulton's father, served as the Cheatham County Circuit Court Clerk prior to Ms. Moulton, occupying the position for twenty-four years. He testified that the three jury commissioners met every two to three months to select names, and he recalled Junior Dozier, the tax assessor, providing him with names from the tax lists. He used the telephone book for this purpose, although most of the names were taken from the voter registration list. He testified that Martha Adkisson was a schoolteacher and sometimes set aside the names of teachers because, at that time, there was a shortage of substitute teachers. He also recalled that, a few times during harvest season, a farmer's name was set aside, and, during the 1970s and 1980s, it was easy for women with young children to get out of serving on the jury, but that changed through the years. He stated that the jury box was charged about every two years. He testified that they went down the voter registration list, wrote down every twentieth or twenty-fifth name, placed it in the box, and tried not to discriminate against any class of potential jurors. Harris said that the voter registration list, the tax list provided by Dozier, and the telephone books were the only sources used in the jury selection at the time of the petitioner's 1986 trial and in 1989.

## II. ANALYSIS

In his argument on appeal, the petitioner has set out five claims, three asserting that counsel were ineffective at his 1986 trial, his 1989 resentencing hearing, and on the direct appeal of his conviction, one asserting that he was prejudiced because of the exclusion of women from the jury panel, and one claiming that imposition of the death penalty violates various of his rights afforded by the federal and state constitutions.

## A. Standard of Review

In order to determine the competence of counsel, Tennessee courts have applied standards developed in federal case law. See State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The United States Supreme Court articulated the standard in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), which is widely accepted as the appropriate standard for all claims of a convicted petitioner that counsel's assistance was defective. The standard is firmly grounded in the belief that counsel plays a role that is "critical to the ability of the adversarial system to produce just results." Id. at 685, 104 S. Ct. at 2063. The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687, 104 S. Ct. at 2064. The Strickland Court further explained the meaning of "deficient performance" in the first prong of the test in the following way:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. . . . No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

Id. at 688-89, 104 S. Ct. at 2065. The petitioner must establish "that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms." House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citing Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996)).

As for the prejudice prong of the test, the Strickland Court stated: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S. Ct. at 2068; see also Overton v. State, 874 S.W.2d 6, 11 (Tenn. 1994) (concluding that petitioner failed to establish that "there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different").

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S. Ct. at 2069; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

By statute in Tennessee, the petitioner at a post-conviction relief hearing has the burden of proving the allegations of fact by clear and convincing evidence. See Tenn. Code Ann. § 40-30-210(f) (1997). A petition based on ineffective assistance of counsel is a single ground for relief, therefore all factual allegations must be presented in one claim. See Tenn. Code Ann. § 40-30-206(d) (1997).

The procedure which we follow in our review was explained in detail by our supreme court in State v. Honeycutt, 54 S.W.3d 762, 766-67 (Tenn. 2001):

> The issue whether a petitioner has been denied the effective assistance of counsel is a mixed question of law and fact. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). A trial court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Under this standard, appellate courts do not substitute their own inferences for those drawn by the trial court, and questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge. Henley, 960 S.W.2d at 579. However, this Court reviews de novo the application of law to those factual findings to determine whether counsel's performance was deficient or whether the defendant was prejudiced by that deficiency. Thus, when evaluating a claim of ineffective assistance of counsel, we review the trial court's findings of fact under a de novo standard, accompanied by a presumption that the findings are correct unless the preponderance of the evidence suggests otherwise, while the trial court's conclusions of law are reviewed de novo with no presumption of correctness. Fields v. State, 40 S.W.3d 450, 457-58 (Tenn. 2001).

**B. Ineffective Assistance of Counsel at 1986 Trial**

The petitioner alleges that trial counsel were ineffective in failing to interview and effectively cross-examine Ken Jones, to object to Sheriff Weakley's participating in the voir dire of prospective jurors, to discover impeachment evidence, and were ineffective as well because of their lack of experience and resources. We will review these claims.

**1. Failure to Interview and Effectively Cross-Examine Ken Jones**

The petitioner argues that trial counsel sanctioned the perjured testimony of Ken Jones at the 1986 trial and failed, at the request of Sheriff Weakley, to effectively cross-examine Jones, these amounting to an actual conflict of interest for the trial attorneys. As we have set out, Ken Jones acknowledged at his deposition in 1999 that he was at the CeBon Motel on the day of the murder to rent a room to be with his paramour. However, at the petitioner's 1986 trial, Jones had testified that he was at the motel because he needed to use the restroom. Trial counsel Stack acknowledged that he knew Jones was at the motel to rent a room with his paramour, but did not cross-examine him on this fact. Sheriff Weakley did not want Jones to be embarrassed and had assured trial counsel that Jones knew nothing about the murder.

To support his arguments as to counsel's limiting his cross-examination of Jones, the petitioner relies upon State v. Thompson, 768 S.W.2d 239 (Tenn. 1989), in which our supreme court explained the broad scope of the right to counsel:

> Plainly, an accused is entitled to zealous representation by an attorney unfettered by a conflicting interest. To establish a denial of the sixth amendment right to counsel, it is sufficient to show that an actual conflict existed. If an attorney actively represents conflicting interests, no analysis of prejudice is necessary; it is presumed that his divided interests adversely affected his representation.

Id. at 245 (citations omitted). The petitioner argues that trial counsel had an actual conflict of interest and, therefore, the second prong of the Strickland test, requiring a showing of prejudice, is eliminated, the petitioner contending that "an actual conflict or an apparent conflict may exist anytime a lawyer cannot exercise his or her independent professional judgment free of 'compromising influences and loyalties.'" State v. Culbreath, 30 S.W.3d 309, 315 (Tenn. 2000) (citing State v. Tate, 925 S.W.2d 548, 554 (Tenn. Crim. App. 1995)). Additionally, the petitioner argues that "[w]hen the fairness of a trial is compromised by an actual conflict of interest, the conclusion that finding that trial counsel's performance, *per se*, deprived the defendant to his right to a fair trial is not subject to 'harmless error analysis.'"

As to these arguments, the State responds that any agreement between Sheriff Weakley and trial counsel not to question Ken Jones about his reason for being at the CeBon Motel did not constitute an actual conflict and, thus, cannot warrant a presumption of prejudice. The petitioner disputes this analysis, citing Rule 1.7(b) of the Rules of Professional Conduct which provides:

> A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

>           (1) The lawyer reasonably believes the representation will not
> be adversely affected; and
>           (2) The client consents in writing after consultation[.]

Tenn. Sup. Ct. R. 8, RPC 1.7(b) (2003).[1] The petitioner notes that the disciplinary rule that was in effect in 1986 provided that "[a] lawyer shall decline proffered employment . . . if it would likely involve the lawyer representing differing interests." He responds to the State's contention that prejudice was not shown by arguing that all he has to do is "undermine confidence in the outcome of the trial." See Kyles v. Whitley, 514 U.S. 419, 434, 115 S. Ct. 1555, 1566, 131 L. Ed. 2d 490 (1995). To support his argument in this regard, the petitioner cites Jones v. Kentucky, 97 F.2d 335 (6th Cir. 1938), where the court determined that the conviction of the defendant was based in part on perjury as follows:

> that "the fundamental conceptions of justice which lie at the base of
> our civil and political institutions" must with equal abhorrence
> condemn as a travesty a conviction upon perjured testimony if later,
> but fortunately not too late, its falseness is discovered, and that the
> state in the one case as in the other is required to afford a corrective
> judicial process to remedy the alleged wrong, if constitutional rights
> are not to be impaired.

Id. at 338.

This court has explained the showing which must be made to establish that counsel had a conflict of interest:

> An actual conflict of interest is usually defined in the context of one
> attorney representing two or more parties with divergent interests. An
> actual conflict of interest occurs when "regard for one duty tends to
> lead to [the] disregard of another." State v. Reddick, 230 Neb. 218,
> 222, 430 N.W.2d 542, 545 (1988); see Gardner v. Nashville Housing
> Authority, 514 F.2d 38 (6th Cir. 1975). In Ford v. Ford, the court
> declared a conflict of interest when an "attorney was placed in a
> position of divided loyalties." 749 F.2d 681, 682 (11th Cir. 1985).
>
>      The right to counsel requires complete devotion to the interest
> of the defendant. State v. Knight, 770 S.W.2d 771 (Tenn. Crim. App.
> 1988). When counsel is unable to provide a "zealous representation
> . . . unfettered by conflicting interests," there has been a breach of the
> right to the effective assistance of counsel. State v. Thompson, 768

---

[1] As the petitioner notes in his brief, this rule is a part of the new Rules of Professional Conduct that came into effect in March 2003.

S.W.2d 239 (Tenn. 1989). In <u>Cuyler v. Sullivan</u>, the United States Supreme Court held that because there is a breach of loyalty in cases involving a conflict of interest, prejudice is presumed. 446 U.S. 335, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980). Unless the petitioner can establish that his counsel "actively represented conflicting interests," he can not established [sic] the constitutional predicate for his claim. <u>Id.</u> at 350. To establish a claim based upon conflict of interests, the conflict must be actual and significant, not irrelevant or "merely hypothetical." <u>Howard Clifton Kirby v. State</u>, No. 03C01-9303-CR-00074 (Tenn. Crim. App., at Knoxville, Sept. 28, 1994).

<u>Jesse Jameel Dawan v. State</u>, No. W2001-00792-CCA-R3-CD, 2002 WL 1483210, at *2 (Tenn. Crim. App. Mar. 11, 2002), <u>perm. to appeal denied</u> (Tenn. Sept. 23, 2002).

The petitioner argues that because the attorneys allowed Mr. Jones to testify falsely at the 1986 trial and agreed not to question Mr. Jones about why he was present at the CeBon Motel on the day of the murder, his trial was not a true adversarial proceeding and that, by not investigating, his attorneys missed an opportunity to develop and present additional defense theories.

The Eighth Circuit explained the limited circumstances in which prejudice may be presumed:

> We believe there is much to be said in favor of holding that <u>Cuyler's</u> [<u>Cuyler v. Sullivan</u>, 446 U.S. 335, 100 S. Ct. 1708 (1980)] rationale favoring the "almost per se rule of prejudice" does not apply outside the context of a conflict between codefendants or serial defendants. As <u>Strickland</u> explained, some finding of prejudice is an essential factor in proving ineffective assistance of counsel. Under <u>Cuyler</u>, loyalties divided between codefendants necessarily will infect the very core of at least one's defense, and prejudice should be presumed. However, the same impact will not be found automatically in other conflict situations. The latter may have such limited consequences that they will not invariably demonstrate prejudice and "a denial of the 'right to have the effective assistance of counsel.'" <u>Cuyler</u>, 446 U.S. at 349, 100 S. Ct. 1708 (quoting <u>Glasser</u> [v. United States], 315 U.S. [60], 76, 62 S. Ct. 457 [(1942)]. In those cases, sound reasoning supports requiring a defendant to prove actual prejudice under the <u>Strickland</u> standard in order to meet the constitutional standard for ineffective assistance of counsel.

<u>Caban v. United States</u>, 281 F.3d 778, 782 (8th Cir. 2002).

While trial counsel did not question Ken Jones as to why he was at the motel, this fact does not result in their representing the interests of Sheriff Weakley. Accordingly, to prevail on this claim, the petitioner must establish that he was prejudiced by trial counsel's not ascertaining and cross-examining Ken Jones's true reason for being at the motel, thus depriving the jurors of this knowledge in addition to missing the opportunity to cross-examine Vernedith White. We will review this argument along with the related claim, made at oral argument, that trial counsel could have created residual doubt by properly dealing with Ken Jones.

In his reply brief, the petitioner points to various portions of the testimony to establish that Ken Jones, himself, might have killed the victim. The petitioner explains how he might have gotten the keys to the victim's car without confronting her, surmising "because of the warmth on the day at issue, [the victim] was wearing only a very light weight summer shift" and that her maid's coat, where she kept her keys and wallet, "was most likely hanging on the cleaning cart, which gave [the petitioner] easy access." The petitioner argues that the statements of Jones and White that they neither saw nor heard anything "that was connected with the crime" are "unbelievable." The victim's schedule to clean the rooms, the petitioner asserts, was such that she would not have reached room 21, where she was killed, until "noon," resulting in Jones and White at least seeing her. The petitioner notes that, at the 1986 trial, Jones said he did not know whether the victim was male or female, yet he told Maxey Kittrell, another witness, that "a woman had been stabbed" and told White that "there was a dead woman in there." This testimony, according to the petitioner's argument, demonstrates "knowledge that no one but the perpetrator could have known." The petitioner points to other discrepancies, including Jones's testimony that the "randomly selected key" which he picked up "just happened to open the lock on room 21, the murder room"; and the fact that White testified that she and Jones were at the motel from 9:00 am until the emergency call, which was made at 2:36 p.m., leaves two hours of Jones and White's activities "unaccounted for." This time period, according to the petitioner's theory, allowed Jones to drive White to Dickson and "to cleanse himself and his van of the victim's blood." The petitioner surmises that Jones then returned to the motel to determine whether the motel owners had come back and found the body, and discovered that this had not occurred. Finally, according to this argument, "by belatedly announcing that a woman had been stabbed to death, Jones successfully removed himself as a suspect and thereby, with the help of his friend the sheriff, was able to keep himself from being investigated by the defense and by the prosecution."

The post-conviction court concluded that the petitioner would not have benefitted from the claim that Ken Jones had killed the victim:

> Petitioner insists that his trial counsel should have attempted to cast suspicion upon Ken Jones as a possible perpetrator of the crime and that counsel was ineffective in allowing Mr. Jones to "perjure" himself in hiding his true reason for being at the hotel. While counsel had brought out that there had been another stranger in the area of the CeBon Motel that morning, they did not develop any reason for the jury to consider that someone other than Petitioner

committed the offense. Petitioner asserts that his trial counsel should have suggested that perhaps, Ms. Jenkins had thwarted Mr. Jones['s] planned sexual liaison with Ms. White and that this was a motive to kill her. He further suggests that their theory might explain the twenty dollar bill under Ms. Jenkins's watch band [sic] and the careful insertion of the knife into her vagina. Trial counsel knew of the actual reason for Mr. Jones['s] presence at the motel, having learned it from the sheriff. Of course, they could have investigated further and learned the details of the encounter but the Court does not find that the information would have been particularly useful. To present such a farfetched theory with no supporting evidence would cause a loss of credibility by the defense at trial. Admittedly, if trial counsel had learned the exact details of the movements of Mr. Jones, Ms. White and the person(s) in the maroon or brown car, they could have "muddied the water" concerning the details of the discovery of the body. This would have been insufficient, however, to cast reasonable doubt on the guilt of Petitioner given the fact that Petitioner was shown by the proof to have taken the deceased's car keys, presumably from her billfold (in which she habitually kept them), and stolen her car. To accept Petitioner's argument that he didn't kill the deceased but merely took her car keys from her body (which was wrapped in a blanket) and stole her car would require the trial jury to depart from speculation and enter into fantasy.

Missing in the petitioner's theory, which the post-conviction court described as "farfetched," is any motive or reason why Jones would want to kill the victim, except the petitioner's suggestion, recounted in the post-conviction's findings, that the victim was killed because she had "thwarted" the sexual liaison between Jones and White. In effect, the petitioner argues that fifty-one-year-old Ken Jones, accompanied by his twenty-one-year-old girlfriend, Vernedith White, following their normal Sunday morning routine and checking into the same motel where they had been together approximately 100 times before and were known by the staff, including the victim, stabbed the victim to death, with Jones driving White to another location, cleaning blood from himself and his vehicle, and then returning to the scene to report the crime and wait for law enforcement officers to arrive. We agree with the post-conviction court that, given the strength of proof against the petitioner, making the argument that Ken Jones was the actual killer would have been "farfetched" and could have resulted in a loss of credibility for the defense.

As our supreme court explained in State v. McKinney, 74 S.W.3d 291 (Tenn. 2002), "'[r]esidual doubt evidence,' in general, may consist of proof admitted during the sentencing phase that indicates the defendant did not commit the offense, notwithstanding the jury's verdict following the guilt phase." Id. at 307 (citing State v. Hartman, 42 S.W.3d 44, 55-56 (Tenn. 2001)). Residual evidence may be that which relates "'to the circumstances of the crime or the aggravating or

mitigating circumstances, including evidence which may mitigate [the defendant's] culpability.'" Hartman, 42 S.W.3d at 56 (quoting State v. Teague, 897 S.W.2d 248, 256 (Tenn. 1995)).

We previously have set out the evidence that the petitioner argues could have been used to establish residual doubt, consisting primarily of contrasting testimony from the jury proceedings in 1986 and 1989 and that of Vernedith White at the post-conviction hearing. Asked at the post-conviction hearing about the significance of this testimony, one of petitioner's trial counsel responded to post-conviction counsel: "To be honest with you at this point and time I don't remember putting all of these time periods together as you are, as you have done right now." Thus, most of the information relied upon by post-conviction counsel was before the jury but was not utilized, as post-conviction counsel has done, to make it appear that Ken Jones might have been the perpetrator. The petitioner argues that, had Vernedith White testified in 1986 or 1989, her "eyewitness information . . . very well could have created reasonable doubt in the minds of the jurors and changed the outcome of the trial." We respectfully disagree with this assertion because White said that Jones was not in the motel room long enough to have killed the victim. Thus, White's testimony would not help the petitioner unless the jurors believed her as to the various times of the events so as to make it appear that Jones could have been the killer, but disbelieved her when she said that Jones could not have killed the victim. While Jones was not truthful in his trial testimony, and its acceptance by trial counsel prevented White from being identified as a witness, their true purpose for being at the hotel would appear to be irrelevant to the guilt, innocence, or punishment of the petitioner. Thus, we concur with the post-conviction court's determination that the petitioner was not harmed by the fact that trial counsel neither discovered Ken Jones's true purpose for being at the motel nor that Vernedith White was with him. See State v. Austin, 87 S.W.3d 447, 459 (Tenn. 2002) (while trial court erred in excluding from evidence vice squad report which may have identified other persons with motive to kill the victim, the "essence" of the report was put before the jury during cross-examination of a witness, so the error was harmless). We conclude, further, that the petitioner would not have created residual doubt by arguing that Ken Jones had killed the victim.

### 2. Failure to Object to Sheriff Weakley's Participation in Voir Dire

The petitioner argues he was prejudiced by the facts that Sheriff Weakley was involved in the voir dire and, because he participated in the investigation, testified at the trial, and "[s]urely . . . possessed an opinion as to [the petitioner's] guilt before the trial and there [was] a great potential for the sheriff to hand-pick jurors sympathetic to the prosecution." Additionally, the petitioner argues that "a jury could easily associate with the credibility of the sheriff who testified against [the petitioner]." Thus, according to the petitioner, he "was denied due process and a trial by a fair jury." The State responds that, as to this argument, the petitioner included no citations to the record required by Rule 10(b) of this court, which would demonstrate the degree of participation by Sheriff Weakley in the jury selection process. Additionally, the State argues that this issue has been waived because no proof was presented as to it during the hearing on the post-conviction petition. We agree with the State's arguments and conclude that this claim has been waived.

### 3. Failure to Discover Impeachment Evidence

The petitioner contends that trial counsel were ineffective by failing to discover impeachment evidence that State's witness Daniel Blair, on the day that he had given the petitioner a ride, was on felony probation for theft of livestock; that State's witness Victoria Hines Daniel Furlong was an alcoholic and had been drinking the day she supposedly saw blood on the petitioner's shirt; that State's witness Ernest Daniel also was an alcoholic and had not testified completely truthfully about Furlong's drinking; and that Melanie Chandler would have contradicted her mother's testimony that the petitioner carried a knife which he had been seen sharpening. We will consider these claims.

As to Daniel Blair, trial counsel acknowledged that they did not investigate his criminal history. The petitioner submits that the combination of the impeachment evidence of Blair's felony, coupled with discrediting his testimony that he saw blood on the petitioner's shirt on the day of the murder, would have affected his credibility. The State argues that Blair's being on probation made him more credible because, in admitting that he had been in Tennessee, he admitted also that he had violated his probation. The post-conviction court found that effectively impeaching this witness would have been unlikely. We agree the petitioner's claim is speculative that Blair successfully could have been impeached with this additional information and conclude, accordingly, that the record supports the post-conviction court's determination.

The petitioner also contends that trial counsel were ineffective in failing to discover that Victoria Hines Daniel Furlong was an alcoholic and had been drinking on the day she testified at the petitioner's trial. At the post-conviction proceeding, she contradicted much of her prior testimony, as we have previously set out. The post-conviction court rejected Furlong's entire testimony as "incredible and worthless." The record supports this determination.

Additionally, the petitioner contends that counsel were ineffective for failing to discover that Ernest Daniel, Victoria Furlong's husband at the time of the petitioner's trial, was not truthful regarding the amount and extent of his wife's drinking. The post-conviction court found Daniel to be in contempt of court at the post-conviction proceeding because he had been drinking prior to testifying. The court found the only fact that it could determine with respect to Daniel's and Furlong's testimony was that they each lied under oath at either the trial or the post-conviction hearing. Given this fact, the court determined that interviewing either of these witnesses would not have benefitted counsel in impeaching them at trial. The record supports this conclusion.

Counsel testified that they did not interview Melanie Chandler or Virginia Chandler prior to trial. Melanie Chandler testified at the hearing that her mother had animosity toward the petitioner and drank heavily. Melanie Chandler admitted that she was not on good terms with her mother. The post-conviction court noted that Chandler "glance[d] affectionately" at the petitioner during the hearing, making it obvious that she still had feelings for him. In conclusion, the court found that the impeachment value of Melanie Chandler's testimony was "marginal, at best." We concur with this assessment. Accordingly, as to this claim, we agree with the conclusion of the post-conviction court that the petitioner failed to establish prejudice.

### 4. Lack of Experience and Resources of Counsel

The petitioner contends both that his counsel were too inexperienced to try a capital case and failed to represent him zealously because the compensation provided appointed attorneys was too low. The court determined that these arguments were without merit, and the record supports this conclusion. We have previously held that inexperience of counsel alone does not equate to ineffective assistance of counsel. Anthony J. Robinson v. State, No. 02C01-9707-CR-00275, 1998 WL 538566, at *2 (Tenn. Crim. App. Aug. 26, 1998). Additionally, the argument that the State's compensation of appointed counsel contributed to the ineffectiveness of counsel has been rejected by this court. See Henry Eugene Hodges v. State, No. M1999-00516-CCA-R3-PD, 2000 WL 1562865, at **21-22 (Tenn. Crim. App. Oct. 20, 2000), perm. to appeal denied (Tenn. Mar. 26, 2001).

## C. Ineffective Assistance of Counsel at 1989 Resentencing

As to this proceeding, the petitioner argues that counsel were ineffective in failing to investigate his background and present effective mitigation proof; failing to challenge the heinous, atrocious, and cruel aggravating circumstance; and failing to give a closing argument. We will consider these claims.

### 1. Mitigation Proof

### a. Family Background/Proof of Abuse

In its opinion affirming the 1989 resentencing of the petitioner, our supreme court set out the mitigation evidence presented in his behalf:

> In mitigation, the defendant presented proof that, while in prison on this conviction, he had presented no serious disciplinary problems and posed no threat to the prison population. The defendant also presented proof of a troubled childhood. His father had abandoned the family when the defendant was young. His mother had an alcohol problem. In his teens the defendant became involved in sniffing gasoline and glue and began to abuse alcohol and drugs. He also exhibited self-destructive behavior. Dr. Pamela Auble, a clinical psychologist, testified that the defendant was suffering from a paranoid personality disorder and dysthymia, or chronic depression. According to Dr. Auble, the defendant would suppress his feelings until they "boiled up" under stress. In her opinion, the defendant, who had returned from turbulent visits with his parents and girlfriend shortly before he committed the murder, was under stress when he killed the victim. Dr. Ann Marie Charvat, a sociologist, also testified

> about the damaging effect of the circumstances of his childhood on the defendant.

*Hines*, 919 S.W.2d at 577. The supreme court characterized the petitioner's mitigation proof as "extensive." Id. at 584.

The petitioner argues that counsel should have called his family members to testify regarding the physical, sexual, and emotional abuse he suffered. Counsel did not call family members as witnesses at resentencing, presenting mitigation proof of the petitioner's abuse through two experts. The petitioner further contends that additional experts should have been employed, and additional proof regarding his treatment at Green River Boys Camp should have been presented. The post-conviction court noted that the detailed mitigation evidence presented at the post-conviction hearing was prepared by two attorneys, three investigators, and several medical experts over a three-year period, stating that that period of time was "far in excess of the time which would have been allowed to prepare for even a capital trial." The court found the additional mitigation proof of the petitioner's family background and abuse, presented at the post-conviction hearing, was essentially the same as that presented at the resentencing, simply more in-depth. Accordingly, the court determined that even with the additional mitigation proof, the aggravating circumstances would have continued to outweigh the mitigating circumstances.

This court has stated that "[a]n investigation so inadequate as to fail to formulate an 'accurate life profile' of the defendant may be the basis for post-conviction relief. Yet the extent of investigation required is largely dependent upon information supplied by the defendant." Bates v. State, 973 S.W.2d 615, 633 (Tenn. Crim. App. 1997) (citing Jackson v. Herring, 42 F.3d 1350, 1367 (11th Cir. 1995); Burger v. Kemp, 483 U.S. 776, 795, 107 S. Ct. 3114, 97 L. Ed. 2d 638 (1987)).

In Goad v. State, 938 S.W.2d 363 (Tenn. 1996), our supreme court set out the relevant factors to consider when determining if prejudice had resulted from a trial attorney's failure to present mitigating evidence during the penalty phase of a capital trial. There, the court found that counsel's failure to investigate, explore, and prepare the proposed mitigating evidence was not "'the result of reasonable professional judgment' and 'fell outside the wide range of professionally competent assistance.'" Id. at 371. If counsel's performance is deficient, the court must next determine if the petitioner has discharged the duty of proving that prejudice resulted from counsel's performance. Id. The court explained how this determination is made:

> [If the] alleged prejudice under Strickland involves counsel's failure to present mitigating evidence in the penalty phase of a capital trial, several factors are significant. First, courts have analyzed the nature and extent of the mitigating evidence that was available but not presented. Second, courts have considered whether substantially similar mitigating evidence was presented to the jury in either the guilt or penalty phase of the proceedings. Finally, the courts have considered whether there was such strong evidence of aggravating

-34-

factors that the mitigating evidence would not have affected the jury's determination.

Id. (citations omitted).

In the present appeal, the post-conviction court found that counsel were not deficient in their representation of the petitioner, saying that "[i]n view of the overwhelming strength of the aggravating factors in Petitioner's case . . . the mitigating factors would not have affected the jury's determination. The jury would be required by logic and common sense to find that the aggravating circumstances outweighed the effect of the mitigating factors beyond a reasonable doubt." Accordingly, under the principles enunciated in Goad, the post-conviction court found that the petitioner was not prejudiced by the fact that counsel at the sentencing hearing had not presented mitigating evidence in the detail that was done at the post-conviction hearing. We conclude that the record supports this determination.[2]

### b. Serotonin Defense

The petitioner contends that resentencing counsel were ineffective for failing to present evidence of his serotonin deficiency. As to this claim, the post-conviction court determined that, based upon the testimony of the witnesses at the hearing, the serotonin evidence was not reasonably available to the petitioner's resentencing counsel, since it was not known to them and could not have been discovered by the exercise of reasonable diligence.

Dr. Rossby acknowledged that he did not work on developing this issue in a criminal case until approximately 1992, three years after the petitioner's resentencing trial. Further, he said that he did not actually testify on the issue of serotonin until 1999, ten years after the petitioner's resentencing trial, and he knew of no one who had testified on this issue prior to that. As the post-conviction court stated: "Petitioner's counsel at re-sentencing could not reasonably have been expected to search for experts on a subject which they did not know existed." The record supports this conclusion.

---

[2] As supplemental authority, the petitioner relies on Wiggins v. Smith, 539 U.S. 510, 516, 123 S. Ct. 2527, 2532, 156 L. Ed. 2d 471 (2003), where the petitioner had sought post-conviction relief from his capital conviction, alleging that trial counsel "had rendered constitutionally defective assistance by failing to investigate and present mitigating evidence of his dysfunctional background." Trial counsel utilized the defense that another person had killed the victim and did not present evidence they had showing the petitioner's "limited intellectual capacities and childlike emotional state . . . and the absence of aggressive patterns in his behavior, his capacity for empathy, and his desire to function in the world[.]" Id. Counsel elected not to use specific information that the petitioner and his siblings were left "home alone for days, forcing them to beg for food and to eat paint chips and garbage," and that he had been "gang-raped" on more than one occasion. Id., 539 U.S. at 516-17, 123 S. Ct. at 2533. The court determined that trial counsel's decision not to utilize background information was one which "did not reflect reasonable professional judgment" and that the petitioner had been prejudiced as a result, there being a reasonable probability that the jury would have returned with a different sentence, had they known this information. Id., 539 U.S. at 534, 123 S. Ct. at 2541-42. In the present appeal, trial counsel presented substantial evidence at the sentencing hearing, although not to the extent that was done at the post-conviction hearing. We find that Wiggins is not applicable.

### c. Heinous, Atrocious, and Cruel Aggravating Circumstance

The petitioner argues that counsel were ineffective at resentencing because they did not challenge the testimony of Dr. Charles Harlan regarding the length of time the victim was conscious and could have lived or experienced pain following the stabbing. At resentencing, the petitioner offered the testimony of Dr. Chris Sperry who disagreed with Dr. Harlan's testimony regarding the victim's consciousness and amount of time she could have survived following the wound to the heart. Dr. Sperry opined that the victim would have been conscious only fifteen to thirty seconds following the stab wound to the heart, as opposed to Dr. Harlan's testimony that the victim lived four to five minutes following the wound to the heart and would have been conscious approximately 80% of that time.

The post-conviction court found counsel were deficient in failing to investigate and introduce testimony to refute Dr. Harlan's conclusions, determining, however, that the petitioner was not prejudiced by the lack of such testimony. The court found that the jury would have been much more persuaded by the testimony of the pathologist who performed the autopsy, as opposed to one who drew conclusions from the autopsy report and photographs. Accordingly, the court concluded that the testimony of Dr. Sperry would not have resulted in reasonable doubt that the victim was conscious during the apparently final wound to the vagina, both pathologists concluding that this wound occurred at or shortly after the time of death. Moreover, the court determined that even if the jury did have reasonable doubt in this regard and did not find this aggravating factor applied, the remaining two aggravating factors were still strong enough to outweigh the mitigating factors as presented at the post-conviction hearing.

As to this issue, the State also argued that even if the victim were unconscious at the time the vaginal wound was inflicted, the jury could have found that the nature and infliction of that wound constituted depravity of mind and that the depraved state of mind of the petitioner existed at the time the fatal blows were inflicted upon the victim. Our supreme court has held that depravity of mind of the murderer may be inferred from acts committed at or shortly after the time of death. See State v. Williams, 690 S.W.2d 517, 529-30 (Tenn. 1985). The court explained that the nature of injuries to a victim may constitute depravity of mind under the holding in Williams:

> The willful insertion of a sharp instrument into the vaginal cavity of a dying woman (or a woman who had just died) satisfies the requirements of Williams, supra. If committed prior to death, these acts constitute torture and thereby also support a finding of depravity. If they occurred close in time to the victim's death, they allow the drawing of an inference of the depraved state of mind of the murderer at the time the fatal blows were inflicted on the victim.

Hines, 919 S.W.2d at 581. We conclude that the record supports the findings of the post-conviction court as to this issue.

### d. Closing Argument

The petitioner contends that his counsel were ineffective in not making a closing argument at resentencing. As to this claim, all three of the petitioner's resentencing counsel testified that their decision to waive closing argument was based on the fact that they did not want the State to present a rebuttal argument. The law is clear that this court may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982); see also Bell v. Cone, 535 U.S. 685, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); State v. Menn, 668 S.W.2d 671, 673 (Tenn. Crim. App. 1984). The post-conviction court concluded that trial counsel had made a tactical decision to waive closing argument to prevent the State's then being able to make a strong rebuttal argument. The record supports this conclusion.

### e. Assistance of Counsel on Direct Appeal

The petitioner also contends that his appellate counsel were ineffective in failing to challenge the constitutionality of the jury instructions at his 1986 trial. He did not present evidence of this issue at the post-conviction hearing, and the post-conviction court did not address it in its order. Moreover, the petitioner did not cite to the record or to any legal authority in making this skeletal argument. Accordingly, this issue is waived. Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b).

### D. Underrepresentation of Women in the Cheatham County Jury Venire

The petitioner contends that there was an underrepresentation of women in the Cheatham County jury venire from which his petit jury was chosen. Because this issue was not presented on direct appeal, it has been waived. Tenn. Code Ann. § 40-30-206(g). Post-conviction proceedings may not be used as a substitute for an appeal to review or correct errors of fact or law allegedly committed by a court of competent jurisdiction. State v. McClintock, 732 S.W.2d 268, 271-72 (Tenn. 1987). However, the petitioner presents this argument in the additional fashion that counsel were ineffective in failing to challenge the composition of the jury at trial. Accordingly, we will review this matter as a claim of ineffective assistance of counsel.

The court noted that at the petitioner's 1986 trial, three of the jurors were women, but there was only one female juror at the 1989 resentencing hearing. Relying on State v. Strouth, 620 S.W.2d 467, 470 (Tenn. 1981), the post-conviction court found that there was no underrepresentation of women on the 1986 jury. As to the 1989 resentencing, the court determined that women were systematically excluded, but the petitioner had failed to show that he was prejudiced by the fact that resentencing counsel did not seek to quash the venire.

Defendants are entitled to a petit jury selected from a representative cross-section of the community. Taylor v. Louisiana, 419 U.S. 522, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975). The Taylor Court held: "the jury wheels, pools of names, panels, or venires from which juries are drawn must

not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." Id., 419 U.S. at 538, 95 S. Ct. at 702. In Duren v. Missouri, 439 U.S. 357, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979), the Supreme Court set forth a three-pronged test for determining whether a jury was properly selected from a fair cross-section of the community:

> (1)     the group alleged to be excluded is a "distinctive" group in the community;
>
> (2)     the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and
>
> (3)     this under-representation is due to systematic exclusion of the group in the jury-selection process.

Id., 439 U.S. at 364, 99 S. Ct. at 668. Based upon the report of Dr. James O'Reilly which provided that the percentage of women in Cheatham County between 1979 and 1990 was 50.6 to 50.7% of the population, but the percentage of women in the Cheatham County jury venire for that same time period was between 10 and 22%, the State conceded that the first two prongs of the Duren test had been satisfied. However, the State argues that the petitioner did not prove the third prong of the Duren test, that the underrepresentation resulted from systematic exclusion of women in the jury selection process.

As to this issue, the post-conviction court found that the petitioner had made a prima facie showing of exclusion:

> By the numerical disparity, Petitioner has established a prima facie case of systematic exclusion. The proof by the State that jurors were selected from a presumably gender balanced voter list does not overcome the fact of the dramatic under-representation of women. In fact, there is no proof which explains the disparity. There can be no explanation other than that the process, for whatever reason, systematically excluded women from Petitioner's 1989 re-sentencing trial.
>
> The Court finds that women were systematically excluded from the jury panel which sentenced Petitioner to death in the 1989 proceeding.

The State disagrees with this conclusion, relying on State v. Nelson, 603 S.W.2d 158 (Tenn. Crim. App. 1980), which explained that "the courts have been reluctant to find the existence of a prima facie case based on statistics alone, instead requiring proof of a substantial disparity coupled with systematic exclusion." Id. at 163 n.3. The Nelson court determined that the systematic

-38-

exclusion prong of the test had been established by proof that the statistical disparity occurred not just occasionally but in every venire for a period of four years, explaining that "[s]uch evidence 'manifestly indicates that the cause of the underrepresentation was systematic that is, inherent in the particular jury-selection system utilized.'" Id. at 165 (quoting Duren, 439 U.S. at 366, 99 S. Ct. at 669). Thus, the court in Nelson found that the jury selection process had not been carried out in conformity with the statutory requirements and explained the proper method of selecting the venire:

> [U]tilization of wholly subjective criteria in a selection process such as Tennessee's will invite a challenge to the array whenever it appears to produce jury venires that are not representative of the community at large. This problem could be avoided by utilization of a random selection or "key number" system, which is in use in many areas of Tennessee, as well as most other states and the federal system. Use of a "key number" applied to county registration lists which are reflective of a cross-section of the community may occasionally produce a venire which appears to underrepresent some identifiable group in the community. However, when an objective selection criterion of this nature is used, such an underrepresentation can be shown to be the result of mischance rather than the deliberate, systematic exclusion of any group.

Id. at 167 (citations and footnote omitted).

We respectfully disagree with the post-conviction court's finding that the underrepresentation of women compels the conclusion that women were systematically excluded from the venire. While the petitioner argues on appeal that "the state offer[ed] no plausible explanation" for the disparity and, therefore, he is entitled, as matter of law, to prevail, we disagree with this claim. In fact, substantial proof is in the record as to how the panel of prospective jurors was selected; and neither the petitioner nor the post-conviction court has identified illegalities or deficiencies in the process. Rather, both simply relied upon percentages of women called to jury duty to conclude that women had been systematically excluded. In Truesdale v. Moore, 142 F.3d 749, 755 (4th Cir. 1998), the court explained that a statistical disparity does not, by itself, establish systematic exclusion of a group from the jury pool:

> Truesdale has not advanced any direct evidence of "systematic exclusion" of African Americans from the venire. Instead he seeks to rely on the bare assertion of substantial underrepresentation to prove that there was a structural or systemic impediment to voter registration by African Americans. We have consistently required more to make out a violation of the "fair cross-section" guarantee. . . . To allow Truesdale to substitute evidence of substantial underrepresentation for evidence of systematic exclusion would go a long way towards requiring perfect statistical correspondence

-39-

between racial percentages in the venire and those in the community. Such a rule would exalt racial proportionality over neutral jury selection procedure.

Accordingly, we conclude that the post-conviction court erred in finding that women had been systematically excluded from the venire.

Regarding this issue as a post-conviction claim, the petitioner must prove that his counsel were ineffective under Strickland because counsel did not challenge the jury venire at trial and/or resentencing. Attorney Stack testified that he had no reason to suspect that women were underrepresented in the jury venire in 1986, and, in fact, three women were on the petitioner's 1986 jury. Moreover, counsel testified that they did not use all of their peremptory challenges at the 1986 trial. Our supreme court has found that the presence of three women on the petit jury constitutes a "fair representation of women on the jury and that is all that is required by the Constitution of the United States." Strouth, 620 S.W.2d at 470. The record supports the post-conviction court's finding that the petitioner was not prejudiced because counsel did not challenge the 1986 venire.

With respect to the 1989 resentencing, Attorneys Weems and Stack testified that they considered challenging the jury venire but knew to do so would cost a vast amount of time. The State argues that counsel were not deficient "to forgo the preparation of a time-consuming jury challenge in favor of developing further mitigating proof, which could spare [their] client the death penalty. All defense attorneys must use their discretion to decide how best to use the time given to them to prepare the defense." The State argues that such decisions are strategic in nature and should not be second-guessed by this court. As to this issue, the post-conviction court found that the petitioner had failed to establish that he was prejudiced by counsel's decision not to challenge the venire. Testimony of the petitioner's 1989 counsel was that this was a strategic decision made in an effort to best utilize the time which they had for trial preparation. Based upon the testimony regarding this issue, the record supports the determination of the post-conviction court that the petitioner failed to show that he was prejudiced because counsel did not seek to quash the 1989 jury.

The petitioner further contends that the post-conviction court erred in ignoring his claims that the grand jury forepersons were selected separately by the judge and the two forepersons, serving from 1979 to 1990, both were male. We note that the only proof as to this claim consisted of short portions of the testimony of Delores Moulton and Lloyd Harris. The petitioner's counsel were not questioned as to the matter, and we have been unable to locate in the petitioner's ninety-six-page proposed findings of fact and conclusions of law, filed after completion of the hearings, a reference that a claim had been presented and the post-conviction court was to rule on the foreperson selection process. Thus, we cannot conclude that this claim was presented to the post-conviction court

separately and not simply as additional information in support of the petitioner's jury claim which we have reviewed. Accordingly, the claim is waived.[3]

### E. Apprendi v. New Jersey and Ring v. Arizona Arguments

The petitioner argues that his death sentence is invalid under the principles set forth in Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), making two basic arguments: (1) the Tennessee Supreme Court substituted its judgment for that of the jury when it determined that it was harmless error for the trial court to have instructed the jury with a former version of the Tennessee Code with respect to the (i)(5) aggravating circumstance; and (2) Apprendi and Ring require the aggravating circumstances to be set forth in the indictment, which was not done in his case. The State responds that neither Apprendi nor Ring may be retroactively applied to the petitioner's case on collateral review, and neither decision extends to Tennessee's capital sentencing procedure or requires that aggravating circumstances be set forth in the indictment.

This court has declined to apply Apprendi and Ring retroactively to support a request for post-conviction relief. See, e.g., Stephen Michael West v. State, No. E2001-02520-CCA-R28-PC (Tenn. Crim. App. Sept. 6, 2002), perm. to appeal denied (Tenn. Jan. 31, 2003); Gregory Thompson v. State, No. M2001-02256-CCA-28M-PD (Tenn. Crim. App. Oct. 3, 2001), perm. to appeal denied (Tenn. May 28, 2002). In so holding, this court has relied on federal cases, concluding that Apprendi did not create a new constitutional right that is retroactively applicable. See Burch v. Corcoran, 273 F.3d 577 (4th Cir. 2001), cert. denied, 535 U.S. 1104, 122 S. Ct. 2311, 152 L. Ed. 2d 1065 (2002); McCoy v. United States, 266 F.3d 1245 (11th Cir. 2001), cert. denied, 536 U.S. 906, 122 S. Ct. 2362, 153 L. Ed. 2d 183 (2002); In re Clemmons, 259 F.3d 489 (6th Cir. 2001); United States v. Moss, 252 F.3d 993, 997 (8th Cir. 2001), cert. denied, 534 U.S. 1097, 122 S. Ct. 848, 151 L. Ed. 2d 725 (2002). Thus, we conclude Apprendi and Ring should not be given retroactive application on collateral review. Regardless, we discern no violation of Apprendi and Ring. As for the petitioner's argument that the ruling of the United States Supreme Court in Ring means that the holding of our supreme court in Dellinger is no longer viable, our supreme court has concluded otherwise. State v. Holton, 126 S.W.3d 845, 863 (Tenn. 2004) ("Ring provides no relief to the defendant and does not invalidate this Court's holding in Dellinger.").

Additionally, the petitioner argues that, at the resentencing hearing, the court "instructed the jury using the 1989 [version of Tenn. Code Ann. § 39-2-203(i)(5)], but then found the error harmless." Further, according to the petitioner, "an aggravating factor, found by the 1989 re-sentencing jury that supported the death penalty was that '[t]he murder was especially heinous, atrocious or cruel in that [sic] involved torture or serious physical injury [sic] beyond that necessary

---

[3]As to this issue, we note that our supreme court, in State v. Bondurant, 4 S.W.3d 662, 675 (Tenn. 1999), explaining the holdings in Rose v. Mitchell, 443 U.S. 545, 99 S. Ct. 2993, 61 L. Ed. 2d 739 (1979), and Hobby v. United States, 468 U.S. 339, 104 S. Ct. 3093, 82 L. Ed. 2d 260 (1984), said that the method of selecting the grand jury foreperson is relevant only as to reviewing the composition of the grand jury as a whole, the "role of the grand jury foreperson in Tennessee [being] ministerial and administrative."

to produce death.'"  Additionally, in this regard, he argues that "[t]he Tennessee Supreme Court held that it was error for the trial court to have instructed the jury using the 1989 language, but then found the error harmless . . . [and] [i]n so doing, the court substituted its own judgment finding that the evidence supported a finding of torture, and further found that had the jury been properly instructed it would have found depravity."  As we will explain, we respectfully disagree that the petitioner has accurately described the jury instructions or the holding of our supreme court in the direct appeal of this matter.

First, contrary to the petitioner's assertions, the jury was instructed using the 1982, not the 1989, version of this statute and found, as one of the aggravating circumstances, that "the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind,"[4] as instructed by the 1982 statute, and not the language of the 1989 statute that, instead of "depravity of mind," involved "serious physical abuse beyond that necessary to produce death."  Accordingly, since the jury was not instructed using the 1989 version of Tenn. Code Ann. § 39-2-203(i), our supreme court could not determine, as argued by the petitioner, that its use was error but harmless. Further, the petitioner's argument that this error in instructing the jury results in there being "no way to determine whether the jurors relied on the torture prong or the serious physical injury [sic] prong in making its determination" is without merit.  In fact, the jury could not have relied on the "serious physical abuse" prong, for this phrase is found only in the 1989 version of the statute, which was not used in the resentencing.

Further, we disagree with the petitioner's claims as to our supreme court's findings as to harmless error in the direct appeal of the resentencing hearing. Although he argues that the court found "it was error for the trial court to have instructed the jury using the 1989 language, but then found the error harmless," this portion of the review, by our supreme court, was as to the adequacy of the instruction for "depravity," which had been defined by the trial court as meaning "moral corruption; wicked or perverse act." Hines, 919 S.W.2d at 587.  Concluding "that this aggravating circumstance has been constitutionally applied under the circumstances of this case and is not unconstitutionally vague," the court explained that "even if the instructions given by the trial judge were unconstitutional . . ., the failure to give a constitutionally proper instruction on depravity was harmless error beyond a reasonable doubt." Id.  Thus, contrary to the petitioner's argument, instead of finding error by the trial court which was harmless, our supreme court determined that even if the resentencing court had committed error in this regard, the error would have been harmless.  Thus, the petitioner's arguments that "the aggravating factor that made [the petitioner] eligible for death in this case was found by a court and not the jury" is without merit, for it is based upon a misreading of the opinion of our supreme court in the direct appeal of the resentencing in this matter.

---

[4]In State v. Middlebrooks, 995 S.W.2d 550, 569 (Tenn. 1999), our supreme court explained that the "phrase "depravity of mind," in the 1982 version, was replaced with the phrase "serious physical abuse beyond that necessary to produce death" in the 1989 version.  At the resentencing hearing, the post-conviction court properly instructed the jury using the 1982 version of Tenn. Code Ann. § 39-2-203(i), which was in effect at the time of the offenses. See id. at 556 n.6.

Finally, the petitioner argues that because the aggravating circumstances that resulted in his being eligible for the death penalty were not set forth in the indictment and returned by the grand jury as required by Apprendi, his sentence must be set aside. However, Apprendi specifically noted the Fifth Amendment right to indictment by a grand jury has not been applied to the states under the due process clause of the Fourteenth Amendment. Apprendi, 530 U.S. at 77 n.3, 120 S. Ct. at 2355. Accordingly, our state supreme court's holdings that there is no constitutional violation due to the failure to allege the aggravating circumstances in the indictment are consistent with Apprendi. See Holton, 126 S.W.3d at 863; State v. Carter, 114 S.W.3d 895, 910 n.4 (Tenn. 2003); State v. Dellinger, 79 S.W.3d 458, 467 (Tenn.), cert. denied, 537 U.S. 1090, 123 S. Ct. 695, 154 L. Ed. 2d 635 (2002). This issue is without merit.

## F. Constitutional Arguments

The petitioner argues that his sentence violates various provisions of the Constitutions of the United States and the State of Tennessee and international law. As the State correctly responds, these arguments have either been previously determined on direct appeal or were waived by the petitioner's failure to make the argument on direct appeal. To the extent the petitioner argues that if an issue was not raised by prior counsel, counsel provided ineffective assistance of counsel, the petitioner has failed to raise any constitutional claim with respect to the death penalty that has not already been rejected by the appellate courts of this state. See, e.g., State v. Stevens, 78 S.W.3d 817, 850-52 (Tenn. 2002), cert. denied, 537 U.S. 1115, 123 S. Ct. 873, 154 L. Ed. 2d 790 (2003); State v. Keen, 31 S.W.3d 196, 233 (Tenn. 2000), cert. denied, 532 U.S. 907, 121 S. Ct. 1233, 149 L. Ed. 2d 142 (2001); State v. Nesbit, 978 S.W.2d 872, 902 (Tenn. 1998), cert. denied, 526 U.S. 1052, 119 S. Ct. 1359, 143 L. Ed. 2d 520 (1999); State v. Vann, 976 S.W.2d 93, 117 (Tenn. 1998), cert. denied, 526 U.S. 1071, 119 S. Ct. 1467, 143 L. Ed. 2d 551 (1999); State v. Caughron, 855 S.W.2d 526, 542 (Tenn. 1993). Accordingly, an ineffective assistance of counsel claim on this issue must fail. The petitioner's claims on this issue are without merit.

## III. CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the order of the post-conviction court denying the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE